JOHN R. HOISINGTON and MARILYN J. HOISINGTON, ET AL, [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Hoisington v. Commissioner
Docket Nos. 24255-81 24289-81, 24290-81, 24291-81, 24292-81, 24293-81, 24294-81, 24295-81.
United States Tax Court
T.C. Memo 1984-375; 1984 Tax Ct. Memo LEXIS 299; 48 T.C.M. (CCH) 556; T.C.M. (RIA) 84375; July 23, 1984. *299 Petitioners were partners in a general partnership, Power Leasing Associates (PLA), which they formed to purchase truck-tractors which would be used to haul freight for a freight transportation company (GTL) in which they were officers and stock-holders. The truck-tractor units were leased to employee-drivers of GTL whe were required to lease the equipment, as owner-operators, to GTL. The purpose of the plan was to convert the Teamster drivers of GTL to owner-operators.The useful life of the truck-tractor units was five years.The term of the leases from PLA to the drivers was 48 months; however, many of the leases were terminated in less than 2-1/2 years. Held: PLA, and hence its partners, was not entitled to an investment credit on the truck-tractor units because, as required by sec. 46(e)(3)(B), IRC 1954, the terms of the leases were not less than 50 percent of the useful lives of the property leased. Thomas J. Kennedy, for the petitioners. Mark. H. Howard, for the respondent. DRENNEN
MEMORANDUM FINDINGS OF FACT AND OPINION DRENNEN, Judge: Respondent determined deficiencies in petitioners' income tax as follows: Year
Docket No.
Petitioner
1974
1976
1977
24255-81
John R. Hoisington and
$ 2,536
$ 3,180
Marilyn J. Hoisington
24289-81
William H. Graves and
15,755
25,683
Helen M. Graves
24290-81
James T. Graves and
11,317
15,598
Karen M. Graves
24291-81
Ronald E. Williams and
$2,510
4,019
Angela J. Williams
24292-81
Dwight L. Graves and
16,074
22,607
Elizabeth E. Graves
24293-81
John J. Graves and
5,412
8,721
Sharon L. Graves
24294-81
Kenneth E. Wallace and
4,987
8,768
Bronice Wallace
24295-81
Lowell P. Graves and
16,680
23,733
Wilda J. Graves
*301 These consolidated cases concern income taxes for the years 1976 and 1977 for the group of taxpayers first named in the captions above who were officers and employees of a corporation named Graves Truck Lines, Inc. (hereinafter referred to as GTL) and who were partners in a general partnership named Power Leasing Associates (hereinafter referred to as PLA or the partnership). The respective wives of each of the partners of PLA are petitioners herein only because they filed joint returns with their respective spouses. The single issue remaining for decision is whether the partners of PLA are entitled to investment credits with respect to eight new White Freightliner Truck-Tractor units purchased by PLA in 1976 and eight new Kenworth, five new Peterbilt, and one used Kenworth truck-tractor units purchased by PLA in 1977, and then leased to former employee-truck drivers to haul freight for GTL as owner-operators. Respondent determined that PLA (and hence its partners) was not entitled to the investment credit because the term of leases to the owner-operators was not less than 50 percent of the useful lives of the property leased, which precludes allowance of the investment credit *302 to the individuals under section 46(e)(3)(B), I.R.C., 1954, as amended. [2]
*303 FINDINGS OF FACT The stipulated facts are found as stipulated. The PLA partnership is a general partnership formed in 1976 and having its principal place of business at Salina, Kansas. The original partners of PLA were William H. Graves, Lowell P. Graves, Dwight L. Graves, John A. Graves, James T. Graves, John J. Graves, Kenneth E. Wallace, and John R. Hoisington. John A. Graves died in April of 1976 and his interest in the PLA partnership was transferred to certain other original partners. John R. Hoisington's interest in the PLA partnership was purchased by petitioner, Ronald L. Williams, effective January 1, 1977. The petitioners and their respective wives filed joint income tax returns for the years indicated with the Office of the Internal Revenue Service at Austin, Texas, and they lived in the places indicated at the time they filed their petitions herein: Place of
Name
Return Years
Residence
John R. Hoisington (Marilyn)
1976-1977
Goddard, Kansas
William H. Graves (Helen)
1976-1977
Salina, Kansas
James T. Graves (Karen)
1976-1977
Salina, Kansas
Ronald E. Williams (Angela)
1974-1977
Salina, Kansas
Dwight L. Graves (Elizabeth)
1976-1977
Witchita, Kansas
(Planters Bank and Trust Co.,
Executor of the Estate of
Dwight L. Graves)
Salina, Kansas
John J. Graves (Sharon)
1976-1977
Salina, Kansas
Kenneth E. Wallace (Bronich)
1976-1977
Witchita, Kansas
Lowell P. Graves (Wilda)
1976-1977
Mission, Kansas
*304 U.S. Partnership Returns of Income for PLA for its tax years ended December 31, 1976 and 1977, were filed with the Office of the Internal Revenue Service at Austin, Texas. Graves Truck Line, Inc., was a Kansas corporation engaged in the motor freight transportation business in Kansas, Nebraska, Colorado, Oklahoma and Texas, and was subject to regulation by the Interstate Commerce Commission, the Department of Transportation, and various State regulatory agencies. Its general freight trucks were operated with over-the-road Teamsters Union drivers. Effective August 30, 1978, GTL was acquired by American Natural Resources Co. pursuant to a merger agreement entered into on or about January 30, 1978. In 1970 GTL started a refrigerated freight division known as its Jayhawk Division. The method of operation of the Jayhawk Division was distinguished from its general freight division in that the over-the-road Teamsters drivers were not utilized, but instead truck-tractors were leased from owner-operators. By 1977 the Jayhawk Division was leasing approximately 120 tractors from owner-operators under leases that were generally terminable by either party on 30 days' notice. GTL did not *305 own or finance any of the truck-tractors it leased from owner-operators. GTL expanded its refrigerated freight division in 1975 when it made arrangements to purchase all the stock of Luper Transportation Company (hereinafter referred to as Luper), a refrigerated truck line that eventually was merged into GTL and became a part of its refrigerated freight division. At the time of its acquisition by GTL, Luper did not utilize the owner-operator system, but instead conducted its business with approximately 25 to 30 over-the-road Teamsters drivers. Soon after it acquired Luper, GTL decided to attempt to persuade the Teamsters drivers of Luper to convert their relationship to that of owner-operators of the vehicles they drove rather than that of Teamsters drivers of the vehicles. GTL believed this arrangement would be more beneficial because the Luper refrigerated unit drivers would then be in a comparable relationship with the drivers of GTL's refrigerated unit drivers (Jayhawk Division), the drivers would be responsible for the maintenance and upkeep of the vehicles, for fuel and repair parts, for insurance, and for loading and unloading the refrigerated cargo. Under the Teamsters *306 contract, the drivers were responsible only for driving the truck-tractors for which they were paid wages on a milage or hourly basis. The owner-operators were to receive as compenation for use of their truck-tractors a percentage of gross revenues generated by transportation services in which their equipment participated. GTL realized that it would take time to convert all of the refrigerator truck drivers into owner-operators and that there would probably be a considerable turnabout by those drivers that did agree to participate in the plan. In negotiations with the Teamsters Union it was agreed that the drivers who became owner-operators would retain their seniority in the union for six months, but after that they would lose their seniority. This was to give the Teamsters drivers an opportunity to determine whether they could make it on their own as owner-operators. GTL also realized that many of the Teamsters drivers would be unable financially to either buy outright or finance the purchase of the equipment to be used. PLA was formed to provide this function and to avoid possible claims of discrimination that might be lodged against GTL if GTL, the carrier, financed the *307 equipment. PLA borrowed from local banks and lending institutions, where the partners had accounts, the funds necessary to buy or at least make down-payments on the equipment, most of which was new. The partnership signed the notes evidencing the loans and each of the partners were personally liable on each note; the equipment provided collateral for the loans. In order to take advantage of GTL's fleet or volume discounts, orders for the equipment were placed in the name of GTL and title to the equipment was originally taken in the name of GTL or its subsidiary, Luper. Also, under the Motor Vehicle Carrier Act the holders of certificates of convenience and necessity were burdened with the administrative responsibility and control of the vehicles. PLA had no office or employees other than those of GTL. Each Teamsters driver or other drivers who agreed to become owner-operators first entered into an "Equipment Finance Lease" with PLA which designated the drivers as "Lessee." Under the terms of the document PLA leased the designated equipment to the Lessee for a term of months, usually 48, commencing on a specified date and expiring on a specified date. The Lessee was to pay *308 to PLA as rental for the equipment a dollar amount per month which, over the term of the lease, would pay PLA the cost of the equipment plus interest and any finance charges, less a striking price (usually $12,000) at which the equipment was to be sold at the termination of the lease. The Lessee was entitled to buy the equipment for the remainder of the purchase price at any time but if the equipment was not sold or disposed of at the end of the term of the lease, it would then be offered for sale at public auction for the striking price. Either party could bid on the equipment at the sale. If it was sold for more than the striking price the owner-operator was entitled to the excess; if it was sold for less than the striking price the owner-operator was obligated to pay the difference to PLA. The Lessee could not assign the lease or sublease the equipment without the written consent of PLA. In the event of default by the Lessee the Lessor could, without notice to the Lessee, terminate the lease and repossess the property; or in lieu thereof, could declare the entire rental to be paid under the lease to be immediately due and payable. There was no provision in the lease permitting *309 the Lessee to cancel, terminate, or extend the lease; however attached to some of the leases was a supplemental agreement giving the Lessee, for a period of six months from the commencement date of the lease, power to terminate the lease without the consent of PLA. Also, attached to some of the leases were agreed upon terms for the purchase of the vehicle by the owner-operator. The Equipment Finance Leases also provided that "Lessee further agrees to place and maintain the Equipment under an owner-operator lease with" GTL or a wholly owned subsidiary thereof. Simualtaneously with execution of the Equipment Finance Lease described above, the owner-operator entered into a companion Equipment Lease Agreement with GTL's Jayhawk Division or Luper under which the owner-operator leased the equipment to Jayhawk or Luper for its exclusive use and control. The lease was effective from the date thereof and was to "continue until the expiration of one year and for successive like periods unless cancelled." The lease could be cancelled by either party upon 30 days written notice. The owner-operator agreed to provide a qualified driver for the equipment, maintenance, insurance, and fuel. *310 The equipment was licensed in Jayhawk's name (as required by law or regulations) but the owner paid Jayhawk the cost of registrations, licenses, etc. The owner was to be compensated at the rate of a stated percentage of gross revenues resulting from the transportation services in which the equipment participated. It was agreed that the owners were not agents of Jayhawk; rather they were independent contractors. It was the understanding between PLA and individual owner-operators that the Equipment Finance Lease between PLA and the owner-operator was to remain in effect only so long as the companion Equipment Lease Agreement with GTL or Luper remained in effect and if the latter was cancelled the former was in default. During 1976 PLA purchased eight new White Freightliner truck-tractor units for $33,319.26 each (exclusive of tires) which with other costs, totalled approximately $280,000. PLA borrowed the $280,000 from The Livestock National Bank of Kansas City and each partner was liable for the entire indebtedness. During 1976 all eight new Freightliners were placed with former drivers of Luper pursuant to Equipment Finance leases. During 1977 PLA purchased eight new Kenworth *311 truck-tractor units for $33,862.00 each, which, with other costs, totalled about $290,000. PLA borrowed $290,000 from Columbia Union National Bank for this purpose. Also during 1977 PLA purchased five new Peterbilt truck-tractor units for $34,073.00 each, which totalled about $180,000, and one used Kenworth truck-tractor unit for $32,000. To finance the five Peterbilt units and the one used Kenworth unit PLA borrowed the sums of $180,000 and $32,000, respectively, from The Livestock National Bank of Kansas City. Each of the 22 truck-tractor units mentioned above had an estimated useful life at the time of its acquisition of five years. PLA made all the payments of principal and interest necessary to repay the aggregate indebtedness of $783,500 mentioned above. All 22 of the above vehicles were placed in service with owner-operators under Equipment Finance Leases and Equipment Lease Agreements. Some of the units were leased for the full term and then were sold to either the Lessee or at public sale. Other units remained leased for relatively short periods of time to the original Lessee who turned it back and the units were then leased to others until they were either sold *312 or wrecked. Still other units were leased to the original Lessees for periods exceeding six months, but less than 48 months, which were subsequently leased to GTL on a month to month basis and later were re-leased by GTL or were sold. A chronological summary of the leasing activities of each of these truck-tractor units is related in the stipulation of facts and is incorporated herein by reference. As of June 30, 1976 the PLA partners owned in the aggregate about 49.45 percent of the issued and outstanding stock of GTL. For the year 1976, the U.S. partnership return of income filed for PLA reported a total loss of $109,353, including an expense for depreciation of $97,737. It also reported new investment credit property with a life of from five to seven years in the amount of $266,554. The partners each claimed their share of the partnership depreciation and investment credit on their individual tax returns for the year 1976. For the year 1977, the U.S. partnership return of income filed for PLA reported a total loss of $126,598, including an expense for depreciation of $186,140. It also reported new investment credit property with a life of five to seven years in the amount *313 of $441,261, and used investment credit property with a life from five to seven years in the amount of $32,000. The partners each claimed their share of the partnership depreciation and investment credit on their individual tax returns for 1977. In his audit of the PLA returns of income for the years 1976 and 1977 respondent disallowed the deduction for depreciation claimed on the truck-tractors here involved while they were being operated by the owner-operators and also determined that the investment credit was not allowable on the truck-tractors "sold" in 1976 and 1977 because those units were not a qualified investment. Also the investment credit for the repossessed units was not allowable under the provisions of Section 46(e)(3) of the Internal Revenue Code. In the notices of deficiency issued to the petitioners respondent also disallowed the deductions for depreciation and the investment credits claimed by petitioners on their 1976 and 1977 returns as their shares of the depreciation and investment credit which PLA claimed on the truck-tractors here involved. OPINION The only issue remaining for decision is whether the term of the original leases *314 on the truck-tractor units here involved was 50 percent or more of the useful life of the unit, thereby precluding any investment credit to the petitioners under Section 46(e)(3)(B) of the Code. The pertinent part of Section 46(e)(3) reads as follows: (3) Noncorporate Lessors - A credit shall be allowed by section 38 to a person which is not a corporation with respect to property of which such person is the lessor only if -- * * * (B) the term of the lease (taking into account options to renew) is less than 50 percent of the useful life of the property, and for the period consisting of the first 12 months after the date on which the property is transferred to the lessee the sum of the deductions with respect to such property which are allowable to the lessor solely by reason of section 162 (other than rents and reimbursed amounts with respect to such property) exceeds 15 percent of the rental income produced by such property. The parties have stipulated that the "section 162" deductions exceeded 15 percent of the rental income produced by the property for the first 12 months after *315 the date it was transferred to the owner-operator. The parties have also stipulated that the useful life of the truck-tractor units involved was five years at the time of acquisition. Thus, the narrow issue remaining is whether the term of the leases was less than 50 percent of the five year useful life of the property leased. The evidence indicates, and we have so found, that most of the original leases of the truck-tractor units from PLA to the owner-operators were for a term of 48 months. [3] On the face of it, PLA is precluded under Section 46(e)(3)(B) from allowance of the investment credit on the equipment so leased because the 48 month term was not less than 50 percent of the five year useful life of the leased property. However, petitioners argue that the parties to the leases "realistically contemplated" that many of the leases would actually be terminated prior to the 24th month of the lease and therefore those leases should be considered to be short term leases. *316 This argument is based on the testimony of the President of GTL that it was anticipated at the outset that it would be a slow process to convert the over-the-road Teamster drivers to the owner-operator concept and that there would be excessive turnabouts by those drivers who entered into the leases, because of the increase responsibility they assumed and their hesitancy about forfeiting their union seniority and pension benefits if they continued as owner-operators for more than six months. Also adding to the tenuousness of these arrangements was the fact that no financial commitment was required of any of the drivers at the beginning of the lease arrangements. Furthermore, petitioners argue, the actual results of the plan validated such expectations because a majority of the original leases were terminated in less than 24 months. This Court had before it in both Bloomberg v. Commissioner,74 T.C. 1368 (1980), and Ridder v. Commissioner,76 T.C. 867 (1981) very similar circumstances and in both cases held that the lessors did not qualify for the investment credit because of Section 46(e)(3)(B). See also Hokanson v. Commissioner,T.C. Memo. 1982-414, *317 affd. 730 F.2d 1245 (9th Cir. 1984). In Bloomberg a physician bought medical equipment in 1974 and immediately leased it to his corporation under a lease having a term of five years which lessor could terminate on lessee's default but which contained no provision for lessee to terminate before the end of the term. The estimated useful life of the equipment was seven years. In 1977 the accountant for both the corporation and the physician-petitioner wrote to petitioner advising that as of that date all equipment leases between petitioner and the corporation were terminated and that petitioner was not to pay himself any more lease payments from the corporation. Petitioner argued that the accountant's letter effectively cancelled the lease prior to the expiration of 50 percent of the useful lives of the equipment, and that such cancellation made the lease null and void ab initio so the property should be considered as first placed in service by petitioner in 1974. The Court disagreed, holding that the determination of entitlement to the investment credit must be made under the conditions that existed in 1974, the year the equipment was first placed in service, *318 and that petitioner could not retroactively change the circumstances to meet the conditions of the statute for tax purposes. We pointed out that the entire thrust of the investment credit provisions relates to the taxable year the property is first placed in service and that it was clear that under the circumstances existing in 1974 the terms of the lease clearly exceeded 50 percent of the useful life of the equipment, so petitioner did not qualify for the investment credit. The factual circumstances in the Ridder case were very similar to those in this case. The owner of a truck-tractor leased his unit to his employer and agreed to drive it on the employer's business. The term of the lease was indefinite, the only provision being that the lease would terminate upon 30 days written notice by either party, or upon mutual consent of both parties on or after one month from the commencement of the lease. The truck-tractor's useful life was six years. It was demolished in an accident within two years of the commencement of the lease. The opinion first discussed the purpose of Congress in adopting Section 46(e)(3), which was to make investment credits available only to those *319 non-corporate lessors actually using the property in question in an active business. Conversely, the credit was denied to purchaser-lessors involved in mere financing arrangements without the on-going risks and obligations associated with an on-going trade or business. The Court disagreed with petitioner's argument that the term of the lease was less than three years because the truck was demolished in an accident in its second year of service. We concluded that in determining whether the term of the lease was less than 50 percent of the useful life of the property, we must look to the terms of the lease entered into by the parties, rather than unforeseeable subsequent events; and that while a Court, in interpreting the language chosen by the parties to a contract, should give great weight to the practical construction placed upon the contract terms by the parties themselves in the course of their performance, future events could not change the terms of the contract itself. Petitioners in this case, as in Ridder, argue that these leases were short term leases because either party could terminate the lease without cause upon 30 days written notice. Here, we do not find any *320 provision in the Equipment Finance Agreements that would permit the lessees to cancel for any reason. The Equipment Lease Agreements between the operator-owners and GTL did provide that the lease shall continue for the period of one year and for successive like periods unless cancelled, and that the lease could be cancelled by either party on 30 days written notice, so if the two agreements were dependent upon each other, both could be effectively cancelled by either party on 30 days written notice. But, as pointed out in Ridder, under such a provision the leases were self extending unless one of the parties cancelled. Therefore, as of the commencement of the leases, the terms of the leases were indefinite and did not comply with the requirement of Section 46(e)(3)(B). The mere potential for termination within the 24 month period is not enough. S.Report 92-437 (1971), 1972-1 C.B. 559, 583, in explaining the purposes of Section 46(d) of the Code (now Section 46(e)(3)), supports this conclusion. It states, in part, that to avoid permitting the investment credit in leasing transactions to shelter other income, the bill makes the credit available to individual lessors *321 in only two situations, the second of which is in the case of short term leases since in those cases the leasing activity constitutes a business activity of the taxpayer rather than a mere investment or financing arrangement. The evidence in this case indicates that the activities of PLA were mere financing arrangements. The primary purpose of the plan, and the only reason for PLA's existence, was to finance the drivers and encourage them to convert from Teamster drivers to owner-operators for GTL or its subsidiary. There is no evidence that PLA engaged in any regular business activity. And, while the officers of GTL and PLA might have anticipated that there would be some turnabouts, that was certainly not their intention or objective. Their objective was to convert the Teamster drivers to owner-operators permanently. Had all of the drivers who signed up for the program carried out the terms of the Equipment Financing Leases, the complete conversion of the refrigerated division of GTL to the owner-operator concept would have occurred much more smoothly and possibly sooner. The 48 month term of the original leases was probably set to permit the drivers to make sufficient monthly *322 payments to reimburse PLA for the full cost of the equipment and still make some profit. Had the term been shorter, the monthly payments would have had to be higher and there would have been less chance to get the drivers to convert. The fact that many of the original owner-operators were unable to make it under even the 48 month term, or discovered that they were not happy with the arrangement and preferred Teamster driver status, is not sufficient to alter the clear terms of the leases to qualify PLA or the partners for the investment credit under Section 46(e)(3)(B). Decisions will be entered under Rule 155.
Footnotes
1. By our Order dated May 9, 1983, the following cases were consolidated for purposes of trial, briefing, and opinion: John R. Hoisington and Marilyn J. Hoisington, docket No. 24255-81; William H. Graves and Helen M. Graves, docket No. 24289-81; James T. Graves and Karen M. Graves, docket No. 24290-81; Ronald E. Williams and Angela J. Williams, docket No. 24291-81; Dwight L. Graves and Elizabeth E. Graves, docket No. 24292-81; John J. Graves and Sharon L. Graves, docket No. 24293-81; Kenneth E. Wallace and Bronice Wallace, docket No. 24294-81; and Lowell P. Graves and Wilda J. Graves, docket No. 24295-81.↩
2. The basic issue raised by the notices of deficiency was whether the transactions between PLA and the owner-operator-drivers, evidenced by the "Equipment Finance Leases" between PLA and the individual drivers and the companion "Equipment Lease Agreements" between the individual drivers and GTL, were leases of the equipment to the drivers, as claimed by petitioners, or were sales of the equipment to the drivers, as claimed by respondent. However, on brief respondent states that section 210 of the Tax Equity and Fiscal Responsibility Act of 1982 currently prevents respondent from making the argument that the agreements were conditional sales contracts. Sec. 210 of the Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. 97-248, 96 Stat. 324, 447, provides in part: "(a) In the case of any qualified motor vehicle agreement, the fact that such agreement contains a terminal rental adjustment clause shall not be taken into account in determining whether such agreement is a lease." Because of respondent's concession, we need not determine whether this provision of TEFRA forecloses respondent's argument that these transactions were sales rather than leases. See Leslie Leasing Co. v. Commissioner,80 T.C. 411 (1983). We will consider them to be leases for purposes of this case. An issue with respect to the tires was settled by agreement of the parties. After the trial, respondent filed a Motion for Leave to Amend its Answer to claim that PLA was in reality a financing agent of GTL. This motion was denied.↩
3. Possibly some of the original leases were for less than 48 months. If so, we cannot determine from the record or from the briefs which ones they were. Some of the leases received in evidence as exhibits were for less than 48 months but it would appear that they were second or third leases on the same equipment that had originally been leased to another driver and then surrendered by the original lessee before the full term expired.↩