EUGENE R. CONNOR and MARY P. CONNOR, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Connor v. Commissioner
Docket No. 27471-84.
United States Tax Court
T.C. Memo 1987-223; 1987 Tax Ct. Memo LEXIS 224; 53 T.C.M. (CCH) 724; T.C.M. (RIA) 87223; April 30, 1987. *224 S, a partnership, rented construction equipment to CC and CT on an "as needed" basis, and they paid rent to S for the actual use. S purchased the equipment needed by CC and CT. P was a 50-percent owner of CC and CT and a general partner of S. Held: The parties to the lease realistically contemplated a lease of indefinite duration. The equipment was not leased for less than 50 percent of its useful life, and therefore, P does not qualify for the investment tax credit within the meaning of sec. 46(e)(3)(B), I.R.C. 1954. Paul R. Gauron,Steven J. Comen, and Steven A. Remsberg, for the petitioners. Barry J. Laterman, for the respondent. *225 SIMPSON
MEMORANDUM FINDINGS OF FACT AND OPINION SIMPSON, Judge: The Commissioner determined deficiencies in the petitioners' Federal income taxes as follows: Year
Deficiency
1976
$7,669.00
1977
1,013.82
1978
11,872.18
1979
7,147.80
1980
4,781.00
The only issue for decision is whether petitioner Eugene R. Connor has satisfied the requirements of section 46(e)(3)(B) of the Internal Revenue Code of 1954, [1] relating to noncorporate lessors, and thus is allowed the investment tax credit. FINDINGS OF FACT Some of the facts have been stipulated, and those facts are so found. The petitioners, Eugene R. Connor and Mary P. Connor, husband and wife, resided in North Andover, Massachusetts, at the time the petition herein was filed. They filed their joint Federal income tax returns for the years 1976 through 1980 with the Internal Revenue Service Center, Andover, Massachusetts. During the years in issue, the petitioner, Eugene R. Connor, and his brother, John H. Connor III (the Connors), were equal general *226 partners in Sunset Construction Company (Sunset). Sunset was engaged in the business of leasing heavy construction equipment. Each of the Connors was also a 50-percent shareholder in two corporations, Connor Construction, Inc., a Massachusetts corporation (Connor Construction), and Catamount Construction, Inc., a New Hampshire corporation (Catamount). Both Connor Construction and Catamount were actively engaged in the business of construction contracting. Connor Construction was organized in 1964 and was a "union shop." Its business centered around the construction of public projects, such as schools, water and sewage treatment plants, pumping stations, and other public buildings and pollution control projects. It sought and performed projects primarily within a 25 to 30 mile radius of its offices in Burlington, Massachusetts. In 1973 and 1974, the Connors realized that the bids by Connor Construction for projects in the areas north of Boston in Massachusetts and New Hampshire were meeting with stiff competition from non-union construction companies. Consequently, in 1974, the Connors formed Catamount to be a non-union company or "open shop." Catamount was intended to perform *227 most of its work in New Hampshire, while Connor Construction was to continue its focus on the Massachusetts area. The Connors believed that, although Catamount generally paid wages at the same level as Connor Construction, Catamount could submit lower bids because it was free of certain jurisdictional limits imposed by the union on workers of Connor Construction. The simultaneous operation of a union and a non-union construction company, both of which are under common ownership, is referred to as a "double-breasted" operation. Failure to operate the two companies as separate, distinct entities can result in a finding that an entity is engaged in an unfair labor practice. Inter-company loans and the rental of equipment back and forth between Connor Construction and Catamount might have raised questions over whether the double-breasted operations were separate and distinct. The sanctions which might be imposed for engaging in an unfair labor practice would have the effect of destroying the competitive edge of a non-union company. In part, to avoid being cited for unfair labor practices, the Connors decided to form an independent, third-party entity, Sunset, in 1974. Its primary *228 purpose was to acquire and lease heavy construction equipment to Connor Construction and Catamount and, in so doing, insulate the two companies from liability to the unions. In addition, the financial statements of both Connor Construction and Catamount looked better as a result of Sunset's ownership of the heavy construction equipment; a contractor's bonding company prefers to see liquid assets on the balance sheet rather than equipment. Because Connor Construction and Catamount specialized in public projects for which bonds were required, the Connors wanted to improve the companies' relationships with the bonding community. Connor Construction and Catamount purchased the smaller pieces of equipment that they regularly use. When heavy equipment was required for a construction job, the Connors had to decide whether the equipment should be purchased or leased. If they decided that it was economically advisable to purchase the heavy equipment, it was acquired and owned by Sunset. From 1974 to the time of trial, the heavy equipment owned by Sunset was rented to Connor Construction or Catamount on an "as needed" basis. The rental arrangements were oral, and the construction company *229 paid rent only for the time the equipment was actually used. After the years in issue, the heavy equipment owned by Sunset was rented occasionally to persons other than Connor Construction or Catamount. However, the primary objective was to have the equipment available for the use of Connor Construction and Catamount, and any rental of it to another person was arranged only when such rental would not interfere with the possible needs of Connor Construction or Catamount. Most of the heavy equipment owned by Sunset was acquired because the Connors believed that it would be needed by Connor Construction or Catamount. The equipment owned by Sunset was stored either at the headquarters of Connor Construction or Catamount when it was not in use. Sunset did not have a storage yard of its own. Sunset was responsible for the maintenance and insurance expenses for its equipment, but the rental charged by Sunset was calculated to assure that Sunset had enough income to pay its ownership expenses. For 1979 and 1980, Connor Construction and Catamount executed written rental agreements with Sunset for a 1-year rental period. These agreements were executed by the Connors after the fact on *230 the advice of the Connors' accountant. The leases were identical in terms. For each year, 1979 and 1980, the same equipment was leased simultaneously to both Connor Construction and Catamount. Sunset charged each corporation the same "monthly rate." The Connors determined the rates at which Sunset was to bill Connor Construction and Catamount for the upcoming year. However, in fact, in accordance with their general practice, Connor Construction and Catamount paid rental only for the time that they actually used the equipment. In 1979, Sunset purchased 19 pieces of equipment at a total cost of $604,478. In 1980, Sunset purchased additional equipment at a total cost of $115,022. The cost recovery periods of the various items of equipment purchased by Sunset in 1979 and 1980 included 3-year, 5-year, and 7-year properties. The dollar amounts of such equipment, allocated among the three separate cost recovery periods, were as follows: 1979
1980
3 Years
$ 28,950
$ 19,876
5 Years
19,572
18,476
7 Years
555,956
76,670
Total
$604,478
$115,022
On their Federal income tax returns for 1979 and 1980, the petitioners claimed investment tax credits attributable *231 to their share of the costs of the equipment purchased by Sunset in those years. In 1980, the petitioners filed an Application for Tentative Refund based on the carryback of unused investment tax credit to the years 1978, 1977, and 1976. Later in 1980, the IRS allowed such refunds. However, in his notice of deficiency issued in 1984, the Commissioner disallowed the investment tax credits claimed for 1979 and 1980 and carried back to 1978, 1977, and 1976 based on the position that the petitioners have not satisfied the requirements of section 46(e)(3)(B) and are ineligible for the investment tax credit. OPINION Section 38 allows a credit against tax for investments in certain depreciable property in an amount determined under section 46. Section 46(e)(3) provides, in pertinent part: (e) Limitations with Respect to Certain Persons. -- * * * (3) Noncorporate lessors. -- A credit shall be allowed by section 38 to a person which is not a corporation with respect to property of which such person is the lessor only if -- * * * (B) the term of the lease (taking into account options to renew) is less than 50 percent of the useful life of the property. * * * The parties *232 agree that the petitioners qualify for the investment tax credit in all respects, except that the Commissioner claims that the properties at issue were leased for more than 50 percent of their useful lives and that, therefore, the petitioners are ineligible for the investment tax credit. The petitioners have the burden of proving that the leases were for less than 50 percent of the useful lives of the properties. Rule 142(a), Tax Court Rules of Practice and Procedure.[2]
In determining whether a lease is of indefinite duration rather than limited to the terms stated in the lease, all facts and circumstances that throw light on the transaction should be considered. Highland Hills Swimming Club, Inc. v. Wiseman,272 F.2d 176 (10th Cir. 1959); Buddy Schoellkopf Products, Inc. v. Commissioner,65 T.C. 640, 656 (1975). The lease term is indefinite if there is a reasonable certainty that the lessee will continue leasing the property beyond the period stated in the lease. G.W. Van Keppel Co. v. Commissioner,295 F.2d 767, 770-771 (8th Cir. 1961), *233 affg. a Memorandum Opinion of this Court; Standard Tube Co. v. Commissioner,6 T.C. 950, 955 (1946). For purposes of section 46(e)(3)(B), the length of a lease term is properly determined by the "realistic contemplation" of the parties. Hokanson v. Commissioner,730 F.2d 1245, 1248 (9th Cir. 1984), affg. a Memorandum Opinion of this Court. The parties' intentions are to be assessed "at the time the lease was entered into, regardless of what eventually happened in subsequent years." Hokanson v. Commissioner,supra at 1248. The actual duration of the lease is not determinative. Ridder v. Commissioner,76 T.C. 867, 875 (1981); Bloomberg v. Commissioner,74 T.C. 1368, 1371 (1980). The petitioners argue that, given the uncertainties of the construction business and the public bidding system, the realistic contemplation of the Connors, when the leases were executed in 1979 and 1980, was that the equipment would be rented on a job-to-job basis. They also argue that they could never be certain what equipment the next job would require. Therefore, they claim that their realistic contemplation was *234 that Sunset would lease out each piece of equipment for the life of one job, perhaps two, but no more. After the job was over, and the equipment was no longer needed, the petitioners claim that the Connors expected to sell the superfluous equipment. On the other hand, the Commissioner argues that realistically and substantively the parties to the leases intended the leases to be of indefinite duration. In judging the intention of the parties to the leases in 1979 and 1980, we observe at the outset that the written leases executed for those years have little significance. The written leases were admittedly executed after the fact and did not reflect the true arrangements for the rental of the heavy construction equipment. In the written leases, the equipment was rented for a term of 1 year, and the same equipment was rented to each of the construction companies. Despite the terms of those written leases, the record as a whole reveals that during 1979 and 1980, Sunset rented the heavy construction equipment to Connor Construction and to Catamount on the same basis as in the preceding and succeeding years. In our view, the evidence in this case establishes that when the leases *235 were arranged in 1979 and 1980, the realistic contemplation of the parties thereto was that the rental would continue indefinitely. From 1974 to the time of the trial, the general practice was that Sunset acquired heavy construction equipment needed by Connor Construction or Catamount and orally rented such equipment to the construction company on an as needed basis. The equipment was acquired because one of the construction companies needed it, and although the equipment was occasionally leased to an outsider, no such rental was arranged when it might interfere with the needs of either Connor Construction or Catamount. The Connors contemplated that the equipment would be retained as long as it was needed by one of the construction companies; there was no proof that any of the equipment acquired in 1979 and 1980 has been sold. So far as we know, all the equipment acquired in 1979 and 1980 is still being rented to the construction companies on an as needed basis. These circumstances lead us to conclude that the heavy equipment owned by Sunset would be leased to the construction companies as long as they needed it. Moreover, it is significant that Sunset, Connor Construction, *236 and Catamount were all under common ownership. Such common ownership assured that Sunset would continue to be operated for the benefit of Connor Construction and Catamount. Sunset was not an independent leasing operation; although it did make some leases to outsiders, those leases were arranged when the use by the outsiders did not interfere with the needs of Connor Construction or Catamount. Sunset did not have its own storage yards; the equipment was left with Connor Construction or Catamount when not being used. The petitioners vigorously urge that the arrangements between Sunset and Connor Construction and Catamount were not motivated by tax considerations. We accept the fact that the arrangements may have, in part, been motivated by bona fide business considerations, not tax considerations. Nevertheless, Congress has provided that the investment credit is not allowable to a noncorporate owner of property who leases the property for more than 50 percent of its useful life, and on this record, the petitioners have failed to prove that the leases by Sunset satisfied that requirement. Consequently, we hold that the petitioners are not entitled to the investment credits claimed *237 by them for 1979 and 1980 and not entitled to the carryback of such credits claimed by them for 1976, 1977, and 1978. Decision will be entered for the respondent.
Footnotes
1. All statutory references are to the Internal Revenue Code of 1954 as in effect during the years in issue.↩
2. Sanders v. Commissioner,T.C. Memo. 1984-511, affd. without published opinion 770 F.2d 174↩ (11th Cir. 1985).