John R. HOISINGTON and Marilyn J. Hoisington, William H. Graves and Helen M. Graves, James T. Graves and Karen M. Graves, Ronald E. Williams and Angela J. Williams, Planters Bank and Trust Company, Executor of the Estate of Dwight L. Graves, Deceased, and Elizabeth E. Graves, John J. Graves and Sharon L. Lewis, formerly Sharon L. Graves, Kenneth E. Wallace and Bronice Wallace, Lowell P. Graves and Wilda J. Graves, Plaintiffs–Appellants,

v.

COMMISSIONER OF INTERNAL REVENUE, Defendant–Appellee.

No. 85–1229.

United States Court of Appeals, Tenth Circuit.

Nov. 25, 1987.

---

Thomas J. Kennedy (Daniel K. Diederich, with him on briefs), Kennedy Berkley Yarnevich & Williamson, Chartered, Salina, Kan., for plaintiffs-appellants.

Douglas G. Coulter (Glenn L. Archer, Jr., Asst. Atty. Gen., Michael L. Paup and Robert A. Bernstein, with him on briefs), Tax Div., Dept. of Justice, Washington, D.C., for defendant-appellee.

Before SEYMOUR, SETH and ANDERSON, Circuit Judges.

STEPHEN H. ANDERSON, Circuit Judge.

During the years in issue section 46(e)(3)(B) of the Internal Revenue Code of 1954 ("Code")[1] permitted an investment credit to noncorporate lessors only if, among other requirements, "the term of the lease (taking into account options to renew) is less than 50 percent of the useful life of the property." A partnership formed by the taxpayers involved in this case purchased and leased twenty-two trucks to owner-operators under leases having fixed terms, usually four years, well in excess of fifty percent of the useful lives of the trucks. Cancellation of the leases was permitted on thirty days notice, and fourteen of the leases cancelled within the first half of the useful life period. The taxpayers claimed, and the Commissioner denied, investment credit on all the trucks based on the early cancellation privilege and a contention that early cancellation was expected. In a memorandum decision of the United States Tax Court,[2] the determination of the Commissioner was upheld.[3] The taxpayers appeal. We affirm.

## I.

## BACKGROUND

Power Leasing Associates, a Kansas general partnership ("PLA"), is the entity which issued the leases in question. It was formed in 1976 by the principal operating officers, and forty-nine percent shareholders, of Graves Trucklines, Inc. ("GTL").

In 1970 GTL initiated a refrigerated freight operation designated as its Jayhawk Division. Freight in that division was transported on trucks leased from owner-operators. In 1975 GTL expanded its refrigerated freight business by acquiring Luper Transportation Company, which it operated as a wholly owned subsidiary until 1978. In contrast to GTL's method of operation, Luper transported freight using its own employee-drivers, all of whom were members of the Teamsters Union. Believing that method to be uneconomical, GTL set about converting Luper's twenty-five to thirty Teamster employees to owner-operators by making it possible for them to acquire their own trucks with no down payment, and economical monthly terms. The process was described by

1. Now the Internal Revenue Code of 1986. Tax Reform Act of 1986, Section 2, Pub.L. No. 99–514, 100 Stat. 2085, 2095.

2. 48 T.C.M. 556 (CCH) (1984).

3. Those knowledgeable with respect to tax law will detect a number of potential issues arising from the facts of this case. For reasons not relevant to this opinion all issues except the one addressed have been either settled or conceded, and the parties have confined their arguments to the issue stated.

James Graves in a letter dated March 2, 1978 to American Natural Resources Company, the corporation which purchased GTL in that year:

3. CONVERTING LUPER DRIVERS TO OWNER–OPERATOR STATUS. Whereas virtually all motor carriers engaged in the transportation of truckload perishable products with refrigerated trailers employ owner-operators, at the time of acquisition Luper employed teamster over-the-road drivers paid by the mile pursuant to a collective bargaining agreement. Consequently, Luper was at a competitive disadvantage and only marginally profitable. We had therefore concluded, prior to the acquisition of Luper, that we should make every effort to attempt to persuade Luper drivers to voluntarily become owner-operators. Our Jayhawk division consists exclusively of owner-operators who are compensated at the rate of 62.5% of the revenue pursuant to a standard form "Equipment Lease Agreement", a copy of which is attached hereto.

4. FINANCE LEASE TERMS. On his first tractor, a road driver has trouble coming up with the down payment required under conventional financing formats. Power Leasing Associates resorted to a "Financial Lease" format to avoid this problem. A copy of the standard Finance Lease employed by Power Leasing Associates is attached. Lack of the down payment creates additional risk of default on the part of the driver, but that risk was assumed by the partnership for the benefit of the Luper Transportation Company. Ultimately, it was necessary to provide these drivers with a six month trial period (see the "Supplemental Agreement" attached to the "Equipment Finance Lease") in order to persuade them to give the owner-operator format a try. Ultimately, three or four of the drivers exercised their rights to terminate the Equipment Finance Lease within the six month trial period and the partnership wound up with used equipment on its hands.

5. POWER UNITS AND FINANCE TERMS. I attach a copy of my letter of March 31, 1977 addressed to members of the partnership which describes the trucks purchased, the truck financing obtained by the partnership and the leasehold terms extended to owner-operators. I also attach copies of the truck purchase invoices.

In that same letter Mr. Graves described Power Leasing Associates, including the purpose of that entity and benefits to be derived by the taxpayers in this suit, as follows:

1. THE PARTNERSHIP. The partnership was originally organized in March of 1976 consisting of the four Graves brothers, who each were allocated a 15% interest, plus myself, J.J. Graves, Vice President of Operations, Kenneth E. Wallace, General Manager of the Jayhawk division and John R. Hoisington, General Manager of the Luper Transportation Company with 10% each. John Graves died immediately thereafter and his interest was reallocated. The general partnership was established to purchase new over-the-road power units which would be leased to owner-operators of the Luper Transportation Company. Partners would receive the benefits of investment tax credit and accelerated depreciation for their personal tax returns. An owner-operator could deduct the entire amount of his leasehold payment as a business expense on his personal tax return.

Ex. No. 37–AK. Consistent with the described plan and purposes PLA purchased a total of twenty-two trucks: eight White Freightliners in 1976, and nine Kenworths and five Peterbilt tractors in 1977. The trucks were placed with drivers under terms of documents entitled "Equipment Finance Lease." The leases were net leases, placing the entire burden of maintenance and other expenses, and risk of loss,

on the lessee. They were for stated terms of four years.[4] The monthly rates, inclusive of principal and interest (separately set out in attachments to some of the leases) were calculated to be competitive with a purchase financed on the open market. R. Vol. II at 67. The principal advantage, described by James Graves at trial, was no down payment at the front end.

"[W]e recognized that none of them had the money necessary to finance the down payment that would be required to acquire their tractor from a regular truck dealer or one of the customary conventional financing sources that truck dealers send their customers to or even from a bank because typically the down payment requirement would be in the range of 15 to 25 percent, and since these men had not heretofore owned any interest in a tractor, they hadn't acquired any equity in one with which to finance the down payment on the new tractor. So we concluded that in order to present them with the kind of transaction that they would elect to participate in, it was going to be necessary to structure it in a manner which, in effect, put the down payment on the back end of the transaction instead of the front end of the transaction because otherwise they just didn't have the money to do it with."

*Id.* at 30.

At the termination of the lease the vehicle was to be sold, presumably to the lessee. In any event, as indicated, the lessee was bound to guarantee payment to PLA of $12,000 in a lump sum at the end of the forty-eight month lease term of the original lease. Any amount in excess of $12,000 resulting from a sale at that time belonged to the lessee.

The finance leases required that the lessees lease the vehicles to GTL, inclusive of its subsidiary, Luper. Separate equipment leases were simultaneously executed for that purpose. Those leases were for one year terms, automatically renewing unless cancelled by either party. Additionally, either party could cancel the equipment lease upon thirty days notice.

Those termination provisions are a key element in the taxpayers' contention that the finance leases were not really for four year terms, as stated, but for one year, or thirty days. The taxpayers introduced parol evidence that "[i]t was the understanding between PLA and individual owner-operators that the Equipment Finance Lease between PLA and the owner-operator was to remain in effect only so long as the companion Equipment Lease Agreement with GTL or Luper remained in effect and if the latter was cancelled the former was in default and terminated. (Transcript pp. 59, 40, 54, 56, 77, 80, 90)." Brief of Appellants at 9. The trial court made a finding of fact supporting this point, Doc. 41 at 9, and the government accepts the finding. Brief for Appellee at 6. While the finance leases contained no early termination provision in their standard terms, three of the leases introduced at trial had an attached "Supplemental Agreement," carrying the same date as that on the face of the lease, and signed by both of the parties, giving the lessee the right to cancel at any time within the first six months of the lease. Ex. 30–AD, Nos. 113, 117, and 120.[5] The taxpayers acknowledge that only "some" of the finance leases were subject to the six month termination agreement. Brief of Appellants at 9. But they stress, and the trial court found, that by virtue of negotiations with the Union, Luper drivers were all given an extended period of six months within which they retained their seniority in the union if they left to become independent owner-operators, and became dissatisfied. The trial court finding on the point is pertinent:

---

**4.** Three of the original leases entered into in 1976 contained no entry in the blanks set forth for the stated term of the lease, or for rental. Ex. 30–AD, Nos. 113, 117, and 120. Nothing is made of these omissions by either of the parties.

**5.** These are the same leases to which reference is made in footnote 4, *supra,* leading to the surmise that the supplemental agreements permitting cancellation within six months bore some relation to the absence of a stated term of the leases on their face. Again, however, it must be mentioned that the parties do not pursue this point.

GTL realized that it would take time to convert all of the refrigerator truck drivers into owner-operators and that there would probably be a considerable turnabout by those drivers that did agree to participate in the plan. In negotiations with the Teamsters Union it was agreed that the drivers who became owner-operators would retain their seniority in the union for six months, but after that they would lose their seniority. This was to give the Teamsters drivers an opportunity to determine whether they could make it on their own as owner-operators.

Doc. 41 at 6.

The taxpayers' fundamental factual premise, coupled with the early termination provisions affecting the finance leases, is that PLA expected the lessees to cancel early. The taxpayers contend such an expectation was a realistic assessment of potential dissatisfaction, lack of continuing interest, inability to perform, and so on, which would follow the change from union member-employee to independent owner status, with its additional risks and burdens. R. Vol. II at 39–40. The fact that the lessees were not "married" to their truck acquisition through a down payment made it all the easier to walk away from the transaction. *Id.* at 49. In support of the legitimacy of their expectations of early cancellation at the time the four year leases were entered into, the taxpayers introduced, and strongly emphasize, evidence that most of the leases were in fact cancelled early. Of the twenty-two finance leases five (23%) went the full four year term. Another three were in force more than two and one-half years, making a total of eight out of twenty-two leases (36%) which extended beyond one-half the stipulated five year useful life of the vehicles. Eleven of the twenty-two finance leases were cancelled within the first year. Some vehicles went through multiple transactions. In all "PLA entered into at least 74 separate transactions before all 22 of the units eventually were sold. (Doc. 34 ¶ 47)." Brief of Appellants at 11. The record also discloses substantial periods of time between some of these transactions, although the record does not disclose to what extent

PLA carried the costs of acquisition without offsetting income. It is uncontested that through PLA the taxpayers bore the entire financial obligation and burden of sizable acquisition loans taken out to acquire the vehicles.

It is also undisputed that PLA was not an actively operated business. It was formed for the single purpose described, and engaged in no other activity. It had no employees, and its ministerial functions were largely performed within GTL. Doc. 41 at 7. The taxpayers do not directly dispute the trial court's finding that the activities of PLA were mere financing arrangements. *Id.* at 18.

## II.

## DISCUSSION

In the portion relevant to this case, section 46(e)(3)(B) of the Code provides:

(3) *Noncorporate lessors.*—A credit shall be allowed by section 38 to a person which is not a corporation with respect to the property of which such person is the lessor only if—

. . . .

(B) the term of the lease (taking into account options to renew) is less than 50 percent of the useful life of the property, . . .

The purpose of the limitation (fifty percent of useful life) is explained in the Senate Report accompanying the enactment of section 46(e)(3):

The committee is concerned, however, as was the House, that the restoration of the credit could once again make leasing arrangements motivated largely by tax reasons quite attractive. The committee agrees with the House that it is appropriate to impose limitations on the availability of the investment credit to individual lessors (and other noncorporate lessors).

. . . .

[T]he bill provides, in general, for the allowance of the credit in the case of short-term leases since in these cases the leasing activity constitutes a business activity of the taxpayer, rather than a mere

investment, i.e., a financing arrangement.

S.Rep. No. 92–437, 92d Cong., 1st Sess. at 43–44 (1972–1 Cum.Bull. 559, 583). However, while tax avoidance and "business activity" are prominently mentioned in the legislative history, the statute itself is technical and objective in nature.

On the face of it the taxpayers here clearly do not satisfy the fifty percent requirement necessary to qualify for the investment credit. They do not challenge the fact that the finance leases initially executed were for stated terms well in excess of fifty percent of the useful life of the vehicles involved. Those terms were physically written by the lessor in blanks provided for the purpose in the leases. The blanks appeared on the front page of the leases as paragraph 2, which reads:

2. *Term of Lease*—The term of this Lease shall be for _____ months and shall commence on _____, and shall expire on _____.

Equipment Finance Lease, Exs. 30–AD, 31–AE, 32–AF, 33–AG.

The trial court, in a qualified finding of fact, found in effect that exercise of the thirty day cancellation clause in the equipment lease would control the finance lease as well, although, perhaps, only by way of a default. Doc. 41 at 9.[6] It did not find, and the taxpayers do not suggest, that the thirty day cancellation privilege voided or replaced the fixed term provision of the leases.

It is the taxpayers' position that the early termination privilege, either alone or when coupled with PLA's realistic expectation that the leases would probably be cancelled at an early date, overrides the four year fixed term and converts the leases to something like a month-to-month lease. They stress that lessor and lessee are unrelated parties, not committed to each other beyond thirty days, and that their respective legal rights and duties extend no further. Thus, "the lessor retains the ongoing business risks and obligations. This satisfies the intent of the statute." Brief of Appellants at 20.

We decline to adopt a rule that an early termination clause, whether standing alone or coupled with a generalized expectation that it might be exercised at some unspecified point, is enough to convert a fixed term in excess of fifty percent to one less than fifty percent of the useful life of an asset. No court has ever adopted such a rule. Two courts have specifically refused to equate a cancellation privilege with a lease term for investment credit purposes. *Hokanson v. Commissioner*, 730 F.2d 1245 (9th Cir.1984); *Ridder v. Commissioner*, 76 T.C. 867 (1981). Both cases involved leases having no stated term, but with a right of cancellation, respectively, annually on thirty-days notice, and at any time on thirty-days notice. Thus, there was a stronger argument than is present in this case for recognition of the cancellation privilege as the lease term. In declining to recognize the early termination clause, the tax court stated:

> the lease had, of course, the potential for termination within that period, but there was no way to tell at the outset whether termination would in fact ever occur. It would have been a simple matter to include a maximum termination date in the contract, and any term of less than three years would have sufficed.

*Ridder v. Commissioner*, 76 T.C. at 875.

Admittedly there are good reasons favoring recognition of early cancellation provisions. Such provisions certainly do increase the lessor's economic risk. That risk includes the possibility of having equipment returned early and, therefore, having unleased equipment on hand from a variety of causes: unplanned obsolescence, economic downturns, general owner dissatisfaction or inability, and so on. Similar factors were considered in *McNamara v.*

---

**6.** The taxpayers make virtually no point of the fact that three of the finance leases had a rider permitting cancellation within six months. They rely almost exclusively on the integrated thirty-day cancellation privilege. We assume the six-month cancellation rider to three of the finance leases is not stressed because of the inference that the remaining nineteen leases would deserve different treatment.

*Commissioner,* 827 F.2d 168 (7th Cir.1987), in which the Seventh Circuit focused on economic risks and obligations pursuant to the written lease agreement instead of adopting the "realistic contemplation" test employed by the tax court in reaching its conclusion that the fixed term of a lease should be ignored and a longer term judicially imposed. The taxpayers urge that the *McNamara* economic risk test be applied here. We do not, however, view *McNamara* as attempting to reduce the test for determining all lease terms to a simple search for economic risk. In *McNamara* the leases were for a stated term of *less* than fifty percent of the useful life of the respective assets involved. Confining its opinion to that fact situation, and emphasizing the written agreement as to the lease term, the court stated:

> At least in cases involving leasing activity that is not primarily tax motivated, where the stated lease term in a written lease document satisfies the 50 percent requirement, that document should be respected, and unless the Commissioner can demonstrate that the lease is a "sham," *i.e.,* that there has been a real shifting of all economic risk associated with the leased property from the lessor to the lessee, the lessor is entitled to claim an investment tax credit for the property (assuming of course that the other condition of § 46(e)(3)(B)—the 15 percent expense test—has been met). The parties' realistic contemplation that the lease may extend beyond the stated term is insufficient to achieve such risk-shifting. If a lease is to be deemed a sham, at minimum there must be a fixed intention that the lease will be continuously renewed on the same or substantively identical terms.

*Id.* at 172.

Furthermore, the court in *McNamara* noted that the risk, as a matter of law, had shifted back to the lessor because the lease had terminated. It refused to speculate on chances that the risk would return to the lessee by virtue of a renewal of the lease, however much within the contemplation of the parties, unless the stated lease term was a sham. In the case before us the risk of ownership, inclusive of loss, maintenance, and other expenses, shifted contractually from PLA to the lessees upon execution of the leases.[7] The shift of that risk from the lessee back to the lessor by virtue of the lessee's exercise of an early cancellation privilege was, at the point of lease execution, purely a speculation, which is exactly what the court in *McNamara* refused to do. Adapting the language of *McNamara,* "at a minimum there must be a *fixed* intention" that the lease terms would be shortened. *Id.* (emphasis added).

In short, it boils down to a refusal to permit an investment credit on the basis of a good guess as to the quantum of a potential risk versus actual financial obligation at the commencement of the lease. The statute is phrased in terms of certainty. It does not refer to whether a lease *may* terminate within fifty percent of a property's useful life. The credit is allowed only if "the term of the lease ... *is* less than 50 percent of the useful life of the property." (emphasis added). At the commencement of the leases in this case, the only definite term was four years. No shorter period had sufficient certainty to qualify. That is the crux of our holding in this case. Thirty–six percent of the leases here went beyond the fifty percent point. It could as easily have been fifty-five percent, or some other, widely varying number. The result urged upon us is that every lease, even those ultimately not qualifying, qualifies; potential risk as to some qualifies all. The statute does not award the investment credit on those terms.

Thus, while we recognize the economic jeopardy in which PLA was placed by the early cancellation possibility within these leases, we are unwilling to allow that possibility to override the significance of the

---

7. The taxpayers do not dispute the fact that our evaluation of the leases is controlled by circumstances which existed at the time of execution. Brief of Appellants at 13 ("the 'term' of a lease should be determined by the legal rights and obligations of the parties as of the commencement of the lease."). *See Hokanson v. Commissioner,* 730 F.2d 1245, 1248 (9th Cir.1984); *Bloomberg v. Commissioner,* 74 T.C. 1368, 1372 (1980).

fixed term provision of the lease. That provision appears as the dominant and first expression of the intention of the parties. If the parties had a *fixed* intention that the leases would persist for only a short time, they could have said so in the lease itself. It would have been an easy thing for PLA to fix the lease terms at one year (co-extensive with the term of the equipment lease), or twenty-nine months, or, for that matter, for thirty days (although the paperwork inherent in renewing thirty day leases would have made that proposition impractical).[8] It would not have been impossible to structure the monthly payments at the same rate. The balloon payment already provided for at the end of the fixed term lease could simply have been increased. After all, this was admittedly a financing arrangement, and PLA was free to structure the monthly payments any way it chose.

The taxpayers next contend that the substance over form doctrine or the "realistic contemplation" test are authority for disregarding the stated four year terms of their leases. They argue that our decision in *Highland Hills Swimming Club, Inc. v. Wiseman*, 272 F.2d 176 (10th Cir.1959), and *G.W. Van Keppel v. Commissioner*, 295 F.2d 767 (8th Cir.1961) permit, even require, the written terms of a lease to be disregarded in favor of the actual substance of the transaction. Neither of the cited cases is on point factually or legally. They deal with other provisions of the Code relating to depreciation or amortization deductions, and involving multiple tests rather than the single factor involved here. The facts in *Highland* (a permanent swimming pool installation, sunk in the ground at a club), and *G.W. Van Keppel* (substantial building erected on leased premises) justified the court's view in each case that the stated term of a lease far short of the useful life of the permanent installation was essentially a sham. Actual useful life of the asset involved was imposed for depreciation purposes.

Substance over form is a doctrine which should be resorted to sparingly. It is not a wholesale license to dismantle and reform transactions by hindsight to achieve a certain tax result. In general, bona fide contracts ought to be respected. Further, the doctrine is not the exclusive province of the government. However, the problem with the taxpayers' invocation of substance over form is that they are faced with the dilemma of repudiating their own transaction expressed in terms of their own choosing. Especially in circumstances where the agreement is adverse to the interest of the drafter, the original written version *is* the substance, and the drafter is essentially estopped from denying that point. That is how we view the lease terms here.

The taxpayers also argue that under the "reasonable contemplation" test the four year terms of the leases should be disregarded. They urge that the test here should be as follows:

Was there a reasonable certainty that the Luper drivers would continue leasing the truck-tractor units from PLA for the duration of the 48 month stated term? If no such reasonable certainty existed then the 48 month stated term of the Equipment Finance Lease should be disregarded as not being in reality its actual term.

Reply Brief of Appellants at 10.

The government has successfully invoked the "reasonable certainty" or "reasonable contemplation" test in a number of cases to disregard fixed terms of leases and to impose other terms which would deny tax benefits. *See Hokanson v. Commissioner*, 730 F.2d 1245, 1248 (9th Cir. 1984); *Peery v. Commissioner*, 54 T.C.M. 432 [CCH Dec. 44,170(M)] (1987); *Owen v. Commissioner*, 53 T.C.M. 1480 [CCH Dec. 44,082(M)] (1987); *Connor v. Commissioner*, 53 T.C.M. 724 [CCH Dec. 43,-886(M)] (1987); *Harvey v. Commissioner*, 52 T.C.M. (CCH) 207 (1986); *McNamara v. Commissioner*, 51 T.C.M. (CCH) 1464 (1986); *Smythe v. Commissioner*, 51 T.C.M. (CCH) 158 (1985); *Corkery v. Com-*

---

8. Successive leases are not necessarily aggregated. *Compare* Rev.Rul. 76–266, 1976–2 C.B. 10

with Treas.Reg. § 1.46–4(d)(4). *But see Hunter v. Commissioner*, 50 T.C.M. 57 (CCH) (1985).

**1406**

missioner, 50 T.C.M. (CCH) 228 (1985); *Hunter v. Commissioner,* 50 T.C.M. (CCH) 57 (1985); *Sanders v. Commissioner,* 48 T.C.M. (CCH) 1215 (1984), *aff'd without published opinion,* 770 F.2d 174 (11th Cir. 1985); *Peterson v. Commissioner,* 44 T.C. M. (CCH) 674 (1982). And, the government has been on all sides of the issue, depending on the advantage to be gained. This case is an example. *See also Bloomberg v. Commissioner,* 74 T.C. 1368 (1980) (written lease terms may not be altered).[9]

However, no court has yet held that the "reasonably contemplated use" test is appropriate for reducing the fixed term of a lease under circumstances approximating those here. Based upon our reasoning above with respect to the taxpayers' theory for applying the substance over form doctrine in this case, and reasoning elsewhere herein, we reject the argument that the taxpayers' reasonable contemplation of early cancellation overrides the actual agreement as to the fixed lease term. Just as in substance versus form, the written agreement of the parties also expresses their contemplation with respect to the lease, and they are estopped from repudiating the document which they themselves drafted, in favor of an unexpressed understanding or contemplation alleged to have existed at the time.

### III.

### CONCLUSION

We have considered all of the taxpayers' arguments, specifically addressing those we considered necessary. We conclude that the leases in question on their face fail to qualify for the investment credit. The parties fixed the term of the leases at four years which is in excess of fifty percent of the useful life of the leased equipment. The existence of an early cancellation privilege does not void or override the fixed

term of those leases. The decision of the tax court is AFFIRMED.

---

**9.** For a discussion of the confusion of tests employed by the government to deny tax benefits in the investment credit area, *see* O'Connell, *Maximizing the Investment Tax Credit,* 42 N.Y.U. Inst. on Fed. Tax'n § 5.03[5] (1983); Vitale, *Note —Noncorporate Lessors Retention of the Invest-* *ment Tax Credit Following Recent Judicial Interpretations of Section 46(e)(3)(B),* 37 The Tax Lawyer 187 (Fall 1983); Wiesner, *Traditional Leasing: Is There Life After ERTA?,* 41 N.Y.U. Inst. on Fed. Tax'n § 11.07[2] (1982).