A. JOHN HARVEY III AND DEBORAH H. HARVEY, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Harvey v. Commissioner
Docket No. 6351-84.
United States Tax Court
T.C. Memo 1986-381; 1986 Tax Ct. Memo LEXIS 225; 52 T.C.M. (CCH) 207; T.C.M. (RIA) 86381; August 18, 1986. James S. Levin,Mark L. Sumner, and William E. Fisher, for the petitioners. Sheldon M. Kay, for the respondent. WRIGHT
MEMORANDUM OPINION WRIGHT, Judge: Respondent determined a deficiency of $20,950.66 in petitioners' Federal income tax for 1981. Petitioners dispute respondent's denial of an investment tax credit. The facts have been fully stipulated and are so found. Petitioners A. John Harvey, III (hereinafter referred to as "petitioner" or "Harvey") *226 and Deborah H. Harvey resided in Northboro, Massachusetts, when the petition was filed herein. On their joint 1981 Federal income tax return, petitioner claimed an investment tax credit of $17,776.50, based upon the drilling machine leasing transaction. Respondent disallowed that credit. After concessions, the sole issue is whether petitioners are entitled to an investment tax credit for equipment purchased by Harvey and leased to the corporation. Henry L. Hanson, Inc. ("the corporation") manufactures taps, dies, and plumb bobs. It also sells drill bits. As of November 19, 1981, the stock of the corporation was held as follows: Shares of
Shares of
Name
Common Stock
Preferred Stock
H. Lloyd Hanson Trust
0
96,700
dated 3-21-56
Trust created by H. Lloyd
Hanson on 2-28-69
100
0  A. John Harvey III
(petitioner)
55
2,600
Deborah H. Harvey
(petitioner)
65
6,100
Deborah H. Harvey, custodian
for Katherine Harvey
(petitioners' daughter)
0
2,600
Total
220
108,000
Each share of stock in the corporation had one vote. The holders of the majority of the common stock could cause the corporation to exercise *227 an option to redeem all or any part of the preferred stock. H. Lloyd Hanson (Deborah H. Harvey's father) and Helen Hanson, his wife, were Trustees of the H. Lloyd Hanson Trust dated 3-21-56. During 1981, A. John Harvey III, Deborah H. Harvey, and H. Lloyd Hanson (Hanson) were president, vice-president, and treasurer, respectively, of the corporation. Harvey has served as president since 1973. Hanson was also chairman of the board of directors, of which his wife, Helen Hanson and petitioners were members. The bylaws of the corporation specify that action by the board of directors may be taken at any meeting at which a quorum is present; a majority of the directors then in office constitutes a quorum. The bylaws further provide that the president of the corporation has general supervision and control of the business of the corporation, subject to direction by the board of directors. In response to the corporation's request, on November 25, 1980, the Lynd-Farquhar Company submitted to the corporation a price quotation for an Allen Special Three Spindle No. 2 1/2 Heavy Duty V-Belt Vertical Motor Drive Drilling and Tapping Machine (the drilling machine). On March 19, 1981, the *228 corporation submitted to the Lynd-Farquhar Company a purchase order for the drilling machine. While the drilling machine was under construction the corporation encountered financing problems with respect to the purchase of such machine. During that time it became apparent that industrial bond financing would not be available and the corporation did not consider it desirable either to borrow funds at the prevailing high interest rates or to expend its own funds which were intended for another purpose. Accordingly, by resolution dated November 19, 1981, the corporation's board of directors authorized the corporation to enter into leases with the president and/or vice-president to meet its equipment needs. On December 9, 1981, the Lynd-Farquhar Company sent an invoice to the corporation for the drilling machine. Harvey purchased that machine for $177,765 in order to meet the needs of the corporation. Harvey did not manufacture or produce the drilling machine. On December 21, 1981, Harvey and the corporation entered into an equipment lease whereby Harvey leased the drilling machine to the corporation. The term of the written lease is for the shorter of 48 months or 49 1/2 percent *229 of the useful life of the equipment. The drilling machine is section 38 property with a useful life of 10 years. The drilling machine made only one product, adjustable dies. About 80 percent of the output of the machine is sold to one of the corporation's customers. The corporation had no long-tern supply contract with that customer. The cost of modifying the drilling machine for use by other companies in the same business would not exceed $10,000. The corporation has made no improvements to the drilling machine which would inure to the benefit of the lessor upon termination of the lease. On December 8, 1982, the corporation sent Harvey an invoice for the expenses incurred during the first 12 months of operation of the drilling machine. Petitioner reimbursed the corporation for those expenses. Such reimbursement exceeded 15 percent of the rental income received by petitioner with respect to that machine. During 1981, the corporation paid $95,982 in rental fees with respect to the following equipment leased from third party lessors: a computer, a truck, two copiers, welding equipment, and trailer truck bodies. Respondent's determination in his statutory notice of deficiency *230 to disallow the investment tax credit of $17,776.50, based upon the drilling machine leasing transaction, is presumptively correct and petitioners have the burden of proving otherwise. ; Rule 142(a). Section 38 [1] allows a credit against tax for investments in certain depreciable property in an amount determined under section 46. However, section 46(e)(3) limits the availability of the credit with respect to noncorporate lessors. That subsection provides in pertinent part: (3) Noncorporate Lessors. -- A credit shall be allowed by section 38 to a person which is not a corporation with respect to property of which such person is the lessor only if -- (A) the property subject to the lease has been manufactured or produced by the lessor, or (B) the term of the lease (taking into account options to renew) is less than 50 percent of the useful life of the property, and for the period consisting of the first 12 months after the date on which the property is transferred to the lessee the sum of the deductions with respect to such property which are allowable to the lessor solely by reason of section 162 (other than rents and *231 reimbursed amounts with respect to such property) exceeds 15 percent of the rental income produced by such property. As this Court explained in , "[s]ection 46(e)(3) is a fairly technical provision which can best be understood in terms of its purpose. In general, Congress was concerned that individuals might be tempted to use investment credits to finance the acquisition and leasing of depreciable property as tax shelters." By establishing limitations on the availability of the investment credit, Congress intended to benefit only those noncorporate lessors actually using the section 38 property in an active business -- lessors who had manufactured or produced the property and short-term lessors. . At the same time, Congress intended to deny the investment credit to those purchaser-lessors who were involved merely in financing arrangements *232 without undertaking the risks and obligations of an ongoing trade or business. The property which was the subject of the lease under consideration here was neither manufactured nor produced by petitioner. Thus, petitioner, as a noncorporate lessor, must satisfy the requirements of section 46(e)(3)(B) in order to be entitled to the investment tax credit. These requirements are: (1) a lease term of less than 50 percent of the useful life of the property; and (2) section 162 expenses (other than rents and reimbursed amounts), with respect to the property, in excess of 15 percent of the rental income from the property for the first 12 months after the property is transferred to the lessee. Sec. 46(e)(3)(B). For petitioners to prevail, they must first show that the term of the lease was less than 50 percent of the useful life of the property. On its face, the written lease document specified a term of less than 50 percent of the useful life of the subject property. Respondent argues, however, that the facts presented herein reflect a reasonable certainty that the corporation would continue leasing the drilling machine from petitioner for an indefinite period. He concludes, therefore, *233 that the stated "term" of the lease should be disregarded in determining the term of the lease for purposes of section 46(e)(3)(B).Petitioners maintain, however, that Harvey entered into a written lease agreement with the lessee, which agreement on its face meets the requirements of the statute, and that there are no facts presented here which would cause such written agreement to be set aside and the lease term to be classified as indefinite. The provisions of written documents are not necessarily conclusive for tax purposes. . The substance, rather than the form, of any transaction is controlling. . Thus, applying these principles, it is clear that lease terms may be disregarded. , and cases cited therein. All facts and circumstances that shed light on a transaction should be considered in deciding whether a lease is of indefinite duration wather than limited to the term stated in the lease agreement. , *234 affd. without published opinion ; ; . For purposes of section 46(e)(3)(B), the length of the lease term should be calculated in accordance with the "realistic contemplation" of the parties at the time the lease was entered into. , affg. a Memorandum Opinion of this Court; . If there is a reasonable certainty that the lessee will continue leasing the property beyond the period stated in the lease, the lease term is indefinite. [2];, affg. a Memorandum Opinion of this Court; . Petitioners attempt to distinguish their case from other cases in which this Court *235 disregarded written leases and determined certain lease terms to be indefinite by maintaining that the factors present in those cases are not present here. [3] Our conclusion, however, is based upon all the facts and circumstances surrounding the transaction and no single factor is determinative. *236 The evidence presented in the instant case shows that petitioner purchased the drilling machine in order to meet the specific needs of the corporation. Although the drilling machine could have been altered for use by another manufacturer, this feature was not the primary consideration in petitioner's selection of the drilling machine. Such tailoring of petitioner's purchase to the needs of the corporation indicates that, when the lease was entered into, the parties intended the lease to continue beyond its stated terms, for as long as the corporation needed the machine. See . Another factor for consideration is whether petitioners controlled the corporation. Although petitioner and his wife owned a small percentage of the shares entitled to vote, together they owned a majority of the common stock. Such majority could cause the corporation to redeem all or any part of the preferred stock. Thus, petitioners could cause a redemption of the shares of the corporation held by the H. Lloyd Hanson Trust dated March 21, 1956. Petitioners, therefore, *237 effectively controlled the corporation. Petitioner has been president of the corporation since 1973 and, under the bylaws of the corporation, had the powers to control generally the corporation, subject to the board of directors' direction. In addition, both petitioners were members of the four-person board of directors, and thus controlled half of the votes that could be cast. In an attempt to establish his own lack of control, however, petitioner claims that Hanson had absolute control over the corporation and all decisions pertaining to corporate matters. As chairman of the board, in 1981, H. Lloyd Hanson did not participate in the day-to-day management of the corporation. He did, however, review all major corporate decisions. The parties stipulated that, if called upon, Harvey would testify that his relationship with H. Lloyd Hanson was not cordial or cooperative; that petitioner believed that H. Lloyd Hanson questioned petitioner's business judgment; that in 1981 H. Lloyd Hanson consented to the subject leasing transaction; and that without such consent the transaction would not have been consummated. The evidence, however, is contrary to petitioner's assertions. On *238 January 12, 1978, in an amendment to the 1956 H. Lloyd Hanson Trust, Hanson vested in petitioner, as trustee, the right to exercise all voting rights and other powers with respect to the shares of the corporation owned by Hanson, such provision to take effect when Hanson ceased to be a Trustee. Although such trust was revocable and subject to amendment, we believe that Hanson's actions are relevant. Hanson apparently held petitioner in sufficiently high esteem to name him as a successor trustee with all the rights and responsibilities attendant to that office, and to grant to him the voting rights with respect to the shares of the corporation held by the Trust. [4] Accordingly, we believe that the facts establish the existence of common control of the lessor and the lessee. There is no evidence that either petitioner leased any section 38 property, other than the drilling machine. Standing alone, *239 the fact that Harvey leased equipment only to a related party is not determinative. When considered with the entire record, however, it suggests that the parties contemplated that the drilling machine would continue to be leased to the corporation on a long-term basis. [5]
Upon consideration of the foregoing facts and of the entire record, we believe that respondent is correct in his determination that the lease here in question is of indefinite duration. Although the express term of the original written lease document was less than 50 percent of the useful life of the subject property, the record shows that the parties to that lease realistically contemplated that the lease would extend beyond the stated term. It is clear that the parties intended and expected that the equipment which is the subject of the lease here under consideration would be leased to the corporation for as long as it met the needs of that company. We find that there is a reasonable certainty that the corporation will continue leasing the property beyond the stated lease term and the *240 term is, therefore, indefinite. Thus, petitioners have failed to establish that the term of the subject lease herein is less than 50 percent of the useful life of the leased property. As discussed earlier in this opinion, Congress wanted to make the investment credit available to noncorporate lessors who were using the property in question in an active business. These were determined to be, among others, short-term lessors. It was the intent of Congress to deny the credit to purchaser-lessors who were merely involved in financing arrangements. Here, the corporation ordered the drilling machine but subsequently encountered financing problems. Harvey's purchase of the drilling machine was in response to this situation and the leasing transaction was set up primarily as a financing arrangement and was not the operation by Harvey of a leasing business. Such a transaction was not intended by Congress to entitle the lessor to investment credits. Because of our determination that the 50 percent test for use of the investment tax credit by a noncorporate lessor under section 46(e)(3)(B) has not been met, it is unnecessary to resolve *241 whether petitioners have met the 15 percent test under that section. Petitioners maintain that sound business reasons, as opposed to tax savings, motivated the subject leasing arrangement. Under the facts presented here, the presence or absence of valid business reasons for entering into the subject transaction is irrelevant. See , affd. . For the foregoing reasons, we find that petitioners have not met the requirements of section 46(e)(3)(B) and, therefore, are not entitled to the investment credit with respect to the drilling machine. Decision will be entered for the respondent.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. .↩
3. In , affd. without published opinion , we disregarded stated lease terms and concluded that an individual who purchased certain items of equipment and then leased them to his wholly owned corporation was not entitled to an investment tax credit because the lease term was indefinite. We considered the following facts in arriving at our conclusion: the taxpayer automatically renewed expired leases without renegotiating the lease terms, the taxpayer leased the equipment solely to his wholly owned corporation, such corporation never sought alternate leasing arrangements, the taxpayer purchased equipment to meet the specific needs of the corporation, the taxpayer sold equipment when it was no longer needed by the corporation, the lessor and the lessee were under common control, and the leasing arrangement was established for a tax savings motive.In , a partnership leased all of its personal property to a medical corporation. The individuals who were shareholders in the corporation were also partners in the leasing partnership. The written leases were twice renewed. In concluding that the original written lease was of indefinite duration, we considered the following facts: the partnership purchased equipment to meet the particular needs of the medical corporation, the partnership had an established practice of renewing all leases; common control of the lessor and lessee existed, and, most importantly, the leasing arrangement served no business purpose other than the tax advantage. The Court also noted that the lessee had not expended a considerable sum in making improvements that would benefit only the lessor if the lease were terminated.↩
4. Petitioner's claims are further refuted by the provisions of a Voting Agreement dated September 24, 1984. Hanson, as trustee and beneficiary, granted to petitioner the irrevocable right to vote the stock of the corporation held by Hanson, for the ten-year term of that agreement.↩
5. ; ↩