**Donald G. McNAMARA and Valerie J. McNamara, and Robert F. Christiansen and Lucille L. Christiansen, Petitioners-Appellants,**

**v.**

**COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.**

**No. 86–2739.**

United States Court of Appeals, Seventh Circuit.

Argued March 30, 1987.

Decided Aug. 19, 1987.

John F. Emanuel, Wyte & Hirschboeck, S.C., Milwaukee, Wis., for petitioners-appellants.

James S. Kimball, Appellate Section, Tax Div., Dept. of Justice, Washington, D.C., for respondent-appellee.

Before CUMMINGS, FLAUM and EASTERBROOK, Circuit Judges.

CUMMINGS, Circuit Judge.

The Internal Revenue Code of 1954 allowed a tax credit for investment in certain depreciable property.[1] 26 U.S.C. § 38. Noncorporate lessors of qualifying property were permitted to claim the credit provided that the conditions set out in 26 U.S.C. § 46(e)(3) were satisfied. In this case the taxpayers formed a partnership which leased certain qualifying property to a corporation which they also controlled. The taxpayers claimed investment tax credits for the property on their individual returns for the taxable years 1977, 1978, and 1979. The Commissioner disallowed the credits on the principal ground that the initial requirement of § 46(e)(3)(B) had not been met in that the terms of the leases exceeded 50 percent of the useful life of the leased property. The Tax Court agreed with the Commissioner and the taxpayers appealed.

## I.

F.J.A. Christiansen Roofing Co. operated a roofing contractor business during the years here at issue. The taxpayers individually owned 83.8% of the voting stock in the company and consequently controlled its activities. In 1967 the company determined that it needed additional equipment to operate its roofing business competitively. However, it had a low net worth and limited working capital and was reluctant to incur additional indebtedness because the existence of excessive liabilities on its balance sheet would severely impede its ability to obtain bid bonds necessary to bid on construction projects. It considered leasing the equipment from another entity but found that the cost would be prohibitive. As a result, in early 1968 the taxpayers decided to form a leasing partnership, D & B Associates, which thereafter supplied the company with approximately 40 percent of its equipment needs.

In forming their partnership, the taxpayers were also motivated by a desire to acquire some assets which would be insulated from the risks and seasonal swings of the construction business. Consequently, in addition to leasing equipment to the roofing company, D & B owns real estate which it leases to another related company and has invested in stock and in partnerships involved in oil and gas activities. Despite this diversification, D & B has never leased equipment to anyone other than its related corporations.

During the three years at issue in this case, D & B purchased and leased the following items to the roofing company: a 1977 Mack truck, a 1978 Mack truck, a Toshiba copier, a 1979 25–ton Grove hydraulic truck crane, and a 1979 35–ton P & H hydraulic truck crane. The original written lease document for each of these assets provided that the lease term was to be for a period of less than 50 percent of the useful life of the respective asset and contained a fixed date of termination without an option to renew. Four of the five original leases were in fact later renewed, some at least three times.[2] The renewal leases were not negotiated simultaneously with the original leases, but rather upon expiration of each then existing lease.

On their federal income tax returns for the years 1977, 1978, and 1979, the taxpayers claimed investment tax credits for the five assets leased to the roofing company, all of which qualified as property eligible for the credit under § 38. As already noted, the Commissioner disallowed the credits because in his view each of the lease terms was in reality for a period far exceeding 50 percent of the leased equipment's useful life. The Tax Court agreed with the Com-

---

1. Section 2 of the Tax Reform Act of 1986, Pub.L. No. 99–514, 100 Stat. 2085, 2095, redesignated the "Internal Revenue Code of 1954" "as heretofore, hereby or hereafter amended" as the "Internal Revenue Code of 1986." However, because the years at issue on this appeal are 1977, 1978, and 1979, all references to Code sections will be to the Internal Revenue Code of 1954.

Section 211 of the 1986 Act, 100 Stat. at 2166, repealed the investment tax credit, subject to certain limited exceptions, for property placed in service after December 31, 1985.

2. A partnership related to D & B and a subsidiary of the roofing company entered into a subsequent lease with regard to the Grove crane, the subject of the fifth lease.

missioner's determination. Although each written lease document expressly provided that the lease term was to be for less than 50 percent of the useful life of the subject property, the court found that the lease terms were actually of indefinite duration. Because the 50 percent requirement of § 46(e)(3)(B) was not satisfied, it held that the taxpayers were not entitled to the credits claimed with respect to the leased equipment.

## II.

Section 46(e)(3) limits the ability of noncorporate lessors to claim investment tax credits for the property they lease. A noncorporate lessor may claim a credit for leased property only if:

(A) the property subject to the lease has been manufactured or produced by the lessor, or

(B) the term of the lease (taking into account options to renew) is less than 50 percent of the useful life of the property, and for the period consisting of the first 12 months after the date on which the property is transferred to the lessee the sum of the deductions with respect to such property which are allowable to the lessor solely by reason of section 162 (other than rents and reimbursed amounts with respect to such property) exceeds 15 percent of the rental income produced by such property.

Congress' intent in enacting § 46(e)(3) was to prevent individuals from using investment credits to finance the acquisition and leasing of depreciable property as tax shelters. See *Freesen v. Commissioner*, 798 F.2d 195, 199 (7th Cir.1986); *Ridder v. Commissioner*, 76 T.C. 867, 872 (1981). The House Committee on Ways and Means explained that it wanted to withhold the investment credit from lessors whoses leases "represent [not] a normal business transaction of the lessor [but] rather [ ] a passive investment entered into for the purpose of sheltering other income." H.R. Rep. No. 92–533, 92d Cong., 1st Sess. 29, reprinted in 1971 U.S.Code Cong. & Admin.

News 1825, 1844; see also S.Rep. No. 92–437, 92d Cong., 1st Sess. 43–44, reprinted in 1971 U.S.Code Cong. & Admin.News 1918, 1950. The lessor who manufactures the property he leases, § 46(e)(3)(A), is obviously not "a conduit for a credit." *Freesen*, 798 F.2d at 199. Section 46(e)(3)(B) is directed at the pure lessor. The 50 percent test is designed to ensure that the lessor bears much of the economic risk of the property. As we explained in *Freesen*, if a lessor may not lease property for its entire useful life, then he is forced to assume "the risk that the property will depreciate faster than expected (and the concomitant risk in leasing it again—or finding itself unable to lease the item again)." *Id.* The 15 percent test is designed to ensure that the lessor is not a passive conduit but instead furnishes, or at least pays for, services in addition to the property itself. A lessor that pays a substantial portion of the maintenance expenses associated with the leased property is not only active but is also more likely to bear some entrepreneurial risk, which in turn provides him with an incentive to maintain the property efficiently. *Id.* Where the requirements of § 46(e)(3) are met, "the lease arrangement is an integral part of the taxpayer's business and is not likely to have been entered into for the purpose of reducing tax liabilities." H.R.Rep. No. 92–533, 92d Cong., 1st Sess. 29, reprinted in 1971 U.S.Code Cong. & Admin.News 1825, 1844; see also S.Rep. No. 92–437, 92d Cong., 1st Sess. 43–44, reprinted in 1971 U.S.Code Cong. & Admin. News 1918, 1950–1951.

It is undisputed that each of the original written lease documents specified a fixed, definite term of less than 50 percent of the useful life of the subject property and contained no option to renew. The Commissioner nevertheless argues that the stated terms of the lease agreements should be disregarded, see *G.W. Van Keppel Co. v. Commissioner*, 295 F.2d 767, 770–771 (8th Cir.1961); *Highland Hills Swimming Club, Inc. v. Wiseman*, 272 F.2d 176, 179 (10th Cir.1959),[3] and that for purposes of

---

**3.** Neither *G.W. Van Keppel Co.* nor *Highland Hills* involved § 46(e)(3)(B). Rather these cases

dealt with the period over which a lessee could depreciate or amortize the cost of improve-

§ 46(e)(3)(B) the true length of each lease term should be determined by reference to the "realistic contemplation" of the parties at the time the lease was entered into and the property was first put into service, see *Hokanson v. Commissioner*, 730 F.2d 1245, 1248 (9th Cir.1984); *Ridder v. Commissioner*, 76 T.C. 867, 875 (1981).[4] The Commissioner maintains that a lease term should be deemed indefinite if there is a reasonable certainty that the lessee will continue leasing the property beyond the period stated in the lease. See *G.W. Van Keppel Co.*, 295 F.2d at 770–771.

Agreeing with the Commissioner that the "realistic contemplation" of the parties rather than the stated term of the lease document is controlling in determining whether the 50 percent test of § 46(e)(3)(B) has been met, the Tax Court found that both the D & B partnership and the roofing company realistically contemplated that the leases here at issue would extend beyond their stated terms and that the actual lease terms were therefore indefinite. In support of its conclusion that the parties expected and indeed intended the leases to continue beyond their stated terms, the Tax Court pointed to a number of factors: (1) D & B purchased equipment not for its general marketability but rather to meet the specific operating needs of the roofing company; (2) the cost to the roofing company of leasing from a non-related company would undoubtedly continue to be higher than the cost of leasing from D & B; (3) there was no indication that the roofing company's financial situation would significantly change over time so that it might at some point be able to finance the acquisition of equipment on its own; (4) D & B leased equipment only to related parties; and (5) D & B and the roofing company were under common control and ownership.

In focusing on these particular factors, the Tax Court went rather far afield from the stated purpose behind § 46(e)(3)(B)'s 50 percent test, namely to ensure that the lessor bears real economic risk, as opposed to mere passive investment or financing risk, for a substantial portion of the property's useful life. See *Freesen*, 798 F.2d at 199. The fact that the lessor and lessee may realistically contemplate continuous renewal of a lease certainly cannot afford the lessor the same kind of protection as a binding commitment to renew on identical or essentially similar terms. The principal economic risk associated with the ownership of rental property is the risk of a dramatic reduction in expected rental income in the event that the property is damaged or destroyed, that it becomes technologically obsolescent, or that the property's value unexpectedly declines either because of a downturn in the market for the property or because the property no longer meets the needs of potential lessees. To insulate itself from this risk and guarantee the full recovery of its investment in the property, a lessor must enter into a long-term lease which obligates the lessee to pay a fixed amount of rent over the entire useful life of the property. Short of such an arrangement, the lessor will continue to bear at least some risk associated with ownership of the property. See Rev. Rul. 76–266, 1976–2 C.B. 10, 11 (where lease containing no option to renew is in fact renewed pursuant to independent negotiations at the expiration of the original lease term, the terms of the successive leases need not be aggregated and treated as one lease term for purposes of § 46(e)(3)(B) because "the lessor retained after execution of the first lease the normal active business risks with respect to the predominant portion of the useful life of the property").

---

ments to leased property. Both cases held that the appropriate amortization period was the useful life of the improvements, and not the shorter stated term of the lease.

4. A number of Tax Court memorandum decisions have adopted the "realistic contemplation" test and have disregarded stated terms in written lease documents which on their face satis-

fied the 50 percent requirement. See, *e.g., Peterson v. Commissioner*, 44 T.C.M. (CCH) 674 (1982); *Sanders v. Commissioner*, 48 T.C.M. (CCH) 1215 (1984), affirmed without published opinion, 770 F.2d 174 (11th Cir.1985); *Hunter v. Commissioner*, 50 T.C.M. (CCH) 67 (1985); *Harvey v. Commissioner*, 52 T.C.M. (CCH) 207 (1986).

For example, if the Toshiba copier which D & B leased to the roofing company had depreciated faster than expected so that it was no longer functional at the end of the original lease term, D & B, not the roofing company, would have borne the risk of the decline in the copier's value to the extent that D & B's investment in the machine exceeded the amount of rent collected during the lease term. Similarly, if the roofing company had gone out of business at the end of the first lease term, D & B would have borne the risk associated with attempting to lease all of the equipment again at a perhaps less favorable rate or even with finding itself unable to lease the equipment at all.

The Tax Court found that D & B and the roofing company had an expectation at the inception of the original leases that those leases would be continuously renewed. The court, however, made no finding that the parties had an expectation that the leases would be renewed on the same or nearly similar terms. In fact certain material provisions of the renewed leases did vary from the comparable provisions of the original leases. For example, the rental rates in subsequent leases were reduced (sometimes by as much as one third), the allocation of expenses between lessor and lessee was altered, and options to purchase the leased equipment were removed. Without some expectation that renewal of the leases would occur on the same terms, it is difficult to understand how the economic risk associated with ownership of the leased property would have been shifted from the lessor, D & B, to the lessee, the roofing company.

■■■ Although it chose to disregard the stated terms of the lease documents, the Tax Court did agree with the taxpayers that there were legitimate economic and business considerations underlying the leasing transactions between D & B and the roofing company and that the leases were not entered into for tax avoidance reasons. At least in cases involving leasing activity that is not primarily tax motivated, where the stated lease term in a written lease document satisfies the 50 percent requirement, that document should be respected, and unless the Commissioner can demonstrate that the lease is a "sham," *i.e.*, that there has been a real shifting of all economic risk associated with the leased property from the lessor to the lessee, the lessor is entitled to claim an investment tax credit for the property (assuming of course that the other condition of § 46(e)(3)(B)—the 15 percent expense test—has been met). The parties' realistic contemplation that the lease may extend beyond the stated term is insufficient to achieve such risk-shifting. If a lease is to be deemed a sham, at minimum there must be a fixed intention that the lease will be continuously renewed on the same or substantively identical terms.[5]

■■■ Given the variance in the actual terms of the subsequent leases, it is hard to believe that at the outset of the transactions D & B and the roofing company had a fixed intention to renew the leases continuously on the same or substantively identical terms. However, the Tax Court made no finding with respect to the parties' intentions concerning the substantive terms of renewal, and we will therefore remand the case to allow the court to determine whether any of the five leases at issue were "shams" in the sense outlined above.[6] We stress that the remand is for this limited purpose alone, and we do not intend the Tax Court to conduct a review of the parties' entire business dealings. The decision

---

**5.** It appears that the Commissioner's real concern in cases such as this is the fact that the leasing partnership and the corporate lessee share common ownership and control. Although § 482 of the Code authorizes the Commissioner to reallocate credits between "organizations, trades, or businesses ... owned or controlled directly or indirectly by the same interests" if necessary to prevent evasion of taxes or clearly to reflect income, he has never attempted to invoke that authority to reallocate the investment tax credit in cases involving leasing transactions among related entities.

**6.** The parties also contest whether the 15 percent expense test was satisfied with regard to one of the leased assets, the Grove crane. The Tax Court did not reach this issue, and in light of our disposition, we will not do so either.

of the Tax Court is vacated and the case is remanded for further proceedings consistent with this opinion.