Eugene R. **CONNOR** and Mary P. **Connor**, Petitioners, Appellants,

v.

**COMMISSIONER OF INTERNAL REVENUE**, Respondent, Appellee.

No. 87–1747.

United States Court of Appeals, First Circuit.

Heard Jan. 5, 1988.

Decided May 26, 1988.

Steven A. Remsberg with whom Hinckley, Allen, Snyder & Comen, Boston, Mass., was on brief, for petitioners, appellants.

Stuart E. Horwich, Tax Div., Dept. of Justice, with whom William S. Rose, Jr., Acting Asst. Atty. Gen., Michael L. Paup and Jonathan S. Cohen, Tax Div., Dept. of Justice, Washington, D.C., were on brief, for respondent, appellee.

Before COFFIN, ALDRICH and BREYER, Circuit Judges.

BREYER, Circuit Judge.

A partnership called the Sunset Construction Co. ("Sunset") bought heavy construction equipment in 1979 and 1980 and leased it to two related companies, Connor Construction Corp. ("Connor Construction") and Catamount Construction Co. ("Catamount"). One of Sunset's partners, Eugene Connor, and his wife claimed that Sunset's purchases entitled it to an "investment tax credit," ("ITC"), 26 U.S.C. § 38 (1982) (amended 1986), which they, in turn, could use to reduce their federal income taxes. The Commissioner of Internal Revenue disagreed. In his view, the law would have entitled Sunset (and the taxpayers) to take the credit *but for* Sunset's failure to fulfill one necessary statutory condition. That condition allows an investment tax credit to (1) a person (like Sunset) which is not a corporation, (2) which (like Sunset) buys and then *leases* equipment, *only if*

> (A) the property subject to the lease has been manufactured or produced by the lessor, or
>
> (B) the term of the lease (taking into account options to renew) is less than 50 percent of the useful life of the property [and the lessor himself spends a certain amount of money on, say, upkeep of the rental property].

26 U.S.C. § 46(e)(3)(B) (1982) (amended 1986); see Appendix for full text. The Commissioner pointed out that Sunset did not satisfy (A) for it did not "manufacture[ ] or produce[ ]" the equipment in question. He also found that Sunset failed to meet (B). Although Sunset's written leases for the equipment (to Catamount and Connor Construction) specified terms of one year, the Commissioner believed it reasonably certain that the leases would last far longer. The issue in this case is whether that is so, whether, despite the short one-year *written* term, the leases in fact were for more than half the useful life of the property.

The tax court agreed with the Commissioner. Taking into account "all the circumstances which throw light on ... [the transaction's] nature," *Highland Hills Swimming Club, Inc. v. Wiseman,* 272 F.2d 176, 179 (10th Cir.1959), it found that, "at the time the lease was entered into," *Hokanson v. Commissioner,* 730 F.2d 1245, 1248 (9th Cir.1984), there was a " 'reasonable certainty' " that the leases would continue " 'beyond the stated period of the lease.' " *G.W. Van Keppel v. Commissioner,* 295 F.2d 767, 770 (8th Cir.1961) (quoting tax court memorandum decision). Indeed, it decided that the parties "realistic[ally] contemplat[ed]," *Hokanson,* 730 F.2d at 1248, that the leases would continue indefinitely, beyond the property's depreciation-determined half-life. At the

least, the court said, the taxpayers had not proved the contrary. Tax Court Rules of Practice and Procedure, Rule 142(a), 26 U.S.C. foll. § 7453 (1982) (taxpayers bear burden of proof challenging deficiency assessed by Commissioner). The taxpayers appeal this determination. We affirm the tax court.

### I

■ We must first decide whether, in reviewing the tax court's decision, we should follow the recent Seventh Circuit case, *McNamara v. Commissioner*, 827 F.2d 168 (7th Cir.1987). In *McNamara*, the court interpreted § 46(e)(3)(B) as *requiring* the Commissioner to accept at face value "the stated lease term in a written lease," at least where (1) the "leasing activity ... is not primarily tax motivated" and (2) "the Commissioner can[not] demonstrate that the lease is a 'sham,' i.e., that there has been a real shifting of all economic risk associated with the leased property from the lessor to the lessee." *McNamara*, 827 F.2d at 172. Were we to apply that test here, the taxpayer would win, for the Commissioner concedes that, although Connor and his associate created Sunset to buy and lease equipment, they did so not for tax purposes; they did so for business and labor-related reasons (to keep the building companies more 'liquid;' to keep totally separate the unionized Connor Construction and the nonunionized Catamount). Moreover, Sunset undoubtedly ran certain economic risks when it leased the equipment, *e.g.*, that business conditions would prevent Connor Construction and Catamount from renewing their leases. We have concluded, however, that we ought not to follow the Seventh Circuit.

First, the statute's language does not require a *McNamara* type of test, or any other kind of test. It says only that the "term of the lease (taking into account options to renew)" must be "less than 50 percent of the useful life of the property." It leaves open the question of how the lease's "term" and how the existence of "options to renew" might be shown.

Second, the statute's purposes do not seem to call for the strong "written lease" presumption that the Seventh Circuit has erected. Congress seems to have wanted firms genuinely in the leasing business, say, truck rental companies, to receive the benefit of the investment tax credit, for that credit would encourage them to invest, like any other business. Congress, however, did not want persons *not* genuinely in the leasing business, say, partnerships of doctors, or lawyers, or dentists, to obtain for themselves the benefits of the ITC, say, by buying construction equipment and then leasing it to a construction company that (for various reasons, such as inadequate income) could not itself use the investment tax credit. Congress wished to reserve the ITC's benefits for "normal business transaction[s]," not "passive investment entered into for the purpose of sheltering other income." H.R.Rep. No. 533, 92d Cong., 1st Sess. 29, *reprinted in* 1971 U.S.Code Cong. & Admin.News 1825, 1844.

Congress tried to carry out this objective, not by asking the Commissioner or the courts to examine the motives of the lessor/purchaser or to decide whether, on all the facts, the lessor/purchaser was a legitimate business (near impossible tasks), but rather by establishing a bright line statutory test, based on "lease-life." *Ridder v. Commissioner*, 76 T.C. 867, 872 (1981) ("hard and fast" test adopted by Congress for determining eligibility). Where a non-manufacturing lessor/purchaser enters into short-term leases (and pays some of the upkeep of the leased property), it is *more likely* (though not absolutely certain) that "the lease arrangement is an integral part of the [lessor/purchaser's] ... business and is not likely to have been entered into for the purpose of reducing tax liabilities." H.R.Rep. No. 533 at 29, 1971 U.S. Code Cong. & Admin.News at 1844 (referring to nonmanufacturing requirement). Where the lessor/purchaser enters into a long-term lease (or does not pay any upkeep), it is more likely that the lessor/purchaser is not a professional lessor but is an unrelated person (a doctor or lawyer) with income he hopes to shelter by, in effect, buying equipment for (and leas-

ing the equipment to) a firm that cannot itself take advantage of the ITC.

Congress recognized the highly imperfect nature of this statutory test, a test that, on its face, did not seek to determine whether "all economic risk" associated with ownership had been transferred, *McNamara*, 827 F.2d at 172, but only whether some risks associated with 50 percent of ownership (or more) had been transferred. *See* H.R.Rep. No. 533 at 29, 1971 U.S.Code Cong. & Admin.News at 1844 (calling test only "quite likely" to separate out legitimate lessors). Indeed, precisely because of the approximate nature of the test, Congress provided an escape valve for legitimate professional lessors who fell on the wrong (long-term) side of the bright line; the statutory 'escape valve' permits a disqualified lessor nonetheless to pass on the ITC to the leasing firm, which can then itself use the credit. *See* H.R.Rep. No. 533 at 30, U.S.Code Cong. & Admin.News at 1845. Congress's statutory solution to the problem, then, focuses primarily upon the nature, not of the lessor or lessee, but of the *lease*. And, given this kind of statutory solution, we can find no congressional warrant for shifting the focus of the Commissioner or court away from the likely understanding of the parties in respect to the terms of the lease (including renewals), or for making near dispositive the *motives* of the parties in entering into the transaction.

Third, the Seventh Circuit's test seems to us too far removed from the statutory balance between "administrability" and "motive" that Congress struck. On the one hand, the effort to look into specific lessor/purchaser motives and at whether lessor/purchasers have actually shifted their economic risks (thus making their lease a "sham"), on a case-by-case basis, will prove difficult to accomplish accurately in practice. The way in which parties share particular economic risks is a function, not simply of the "time term" in a written lease, but also of many other terms read in light of the particular business circumstances. If a lessor has complete control of a lessee, the "risk" it chooses to shift is also under its control. It can draft either

long-term, or short-term, leases to impose risks in a host of different ways, all without changing their duration. About the most one can say is that short-term leases *may, in general,* impose greater risks upon lessors; and, that is what Congress found. That fact is precisely what led Congress to write a general rule based on the length of the lease, not to order case-by-case risk assessment.

On the other hand, to make the *written* terms of a lease virtually determinative of the duration question is to risk unfairness and manipulation by permitting different parties with identical long-term expectations to qualify for the ITC or not, depending upon the extent to which those expectations are reduced to writing. This would be especially true in a case like this one, where the written leases were executed after the fact. There is every indication in the statute that Congress wished to reduce the matters of motives and risks to the simple question of the length of the lease (plus renewals) term; but, there is no indication that Congress wished the courts to provide a formal, rather than a realistic, answer to the "lease-life" question.

Of course, the *McNamara* court provided a way for the courts to move beyond the mere formalities of the lease by allowing the Commissioner to prove that a lease is a sham. But this arrangement means that, given a lease with the right language, the Commissioner rather than the taxpayer effectively bears the burden of proof. The Commissioner must demonstrate that the lease is a sham, presumably by using many of the same factors that the taxpayer previously had to use to show his or her "realistic contemplation." This result cuts against the spirit of Rule 142(a), Tax Court Rules of Practice and Procedure, 26 U.S.C. foll. § 7453 (taxpayer bears burden of proof in protesting deficiency assessed by Commissioner). *See United States v. Rexach*, 482 F.2d 10, 15–17 (1st Cir.) (approving rationales underlying allocation of burden of proof to taxpayer), *cert. denied,* 414 U.S. 1039, 94 S.Ct. 540, 38 L.Ed.2d 330 (1973). Rule 142(a) is "an outgrowth" of a well-founded "general rule that deductions are a matter of legislative grace and a taxpay-

er must clearly establish his entitlement to a particular deduction." *Anselmo v. Commissioner*, 757 F.2d 1208, 1211 n. 2 (11th Cir.1985) (citing *New Colonial Ice Co. v. Helvering*, 292 U.S. 435, 440, 54 S.Ct. 788, 790, 78 L.Ed. 1348 (1934)); *see also Hokanson*, 730 F.2d at 1249. We can find no reason here to shift that well-established burden.

Fourth, the Commissioner is more expert than are we in the intricacies of federal tax law. *See Bob Jones University v. United States*, 461 U.S. 574, 596, 103 S.Ct. 2017, 2031, 76 L.Ed.2d 157 (1983) (emphasizing broad authority of those administering tax laws, given complexity of Code). In general, when "[t]he Commissioner's interpretation of [a] ... [r]egulation [or statute] ... has been consistent over the years[,] [it] ... is entitled to respect." *Jewett v. Commissioner*, 455 U.S. 305, 318, 102 S.Ct. 1082, 1090, 71 L.Ed.2d 170 ("This canon of construction ... generally applies to the Commissioner's interpretation of the Internal Revenue Code."); *see also Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–45, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694 (1984). Here, we believe it similarly appropriate to give weight to the Commissioner's well-established views about the *method* of interpreting a statutory term (including as it does significant implications as to who bears the burden of proof in these cases), especially in light of the difficulties we have just set forth in reconciling the Seventh Circuit's rule with what we see as Congress's language, purposes, and approach to the problem it identified. *Cf. Immigration and Naturalization Service v. Cardoza–Fonseca*, 480 U.S. ——, 107 S.Ct. 1207, 1220–21, 94 L.Ed.2d 434 (1987) (question of congressional intent is "pure question of statutory construction" for courts, "quite different" from "question of interpretation" that arises when agency must apply specific standard to facts); *see also Batterton v. Francis*, 432 U.S. 416, 425, 97 S.Ct. 2399, 2405, 53 L.Ed.2d 448 (1977) (explaining, to distinguish amounts of deference given different types of administrative regulation, that "[v]arying degrees of deference are accorded to administrative interpretations, based on such factors as the timing and consistency of the agency's position, and the nature of its expertise"); *Rowan Cos., Inc. v. United States*, 452 U.S. 247, 253, 101 S.Ct. 2288, 2292, 68 L.Ed.2d 814 (1981) (applying *Batterton*-type analysis to tax regulation); *Amato v. Western Union Intern, Inc.*, 773 F.2d 1402, 1411–12 (2d Cir.1985) (deference accorded revenue rulings issued by I.R.S.), *cert. dismissed*, 474 U.S. 1113, 106 S.Ct. 1167, 89 L.Ed.2d 288 (1986); *see generally* K. Davis, 5 Administrative Law Treatise § 29:16 (2d ed. 1984).

For these reasons, we have decided to follow preexisting law in respect to the statute. That is to say, the taxpayer must show that the parties, when they made the lease, "realistic[ally] contempl[ated]" that the lease would cover less than 50 percent of the property's useful life. *Hokanson*, 730 F.2d at 1248; *Ridder*, 76 T.C. at 875. If, on the contrary, there was a " 'reasonable certainty' " at the time the lease was made that the lease would continue beyond the stated period, the lease will be considered of "indefinite duration," regardless of the terms stated in the lease agreement. *Van Keppel*, 295 F.2d at 770–71 (quoting tax court memorandum decision) (determining duration of lease for amortization purposes); *Owen v. Commissioner*, 53 T.C.M. (CCH) 1480, 1483 (1987); *Harvey v. Commissioner*, 52 T.C.M. (CCH) 207, 209 (1986); *Sanders v. Commissioner*, 48 T.C.M. (CCH) 1215, 1219–20 (1984), *aff'd without opinion*, 770 F.2d 174 (11th Cir.1985); *see also Hoisington v. Commissioner*, 833 F.2d 1398 (10th Cir.1987) ("sufficient certainty" required of leasing period).

## II

■ The Tax Court's determination that the taxpayer failed to prove that Sunset's leases of construction equipment were for less than half the useful life of the property is one of fact. Our role is to determine whether that determination was "clearly erroneous," *i.e.*, whether we are left with "the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948); *see Commissioner v. Duberstein*, 363 U.S. 278, 289–91, 80 S.Ct. 1190,

1198–99, 4 L.Ed.2d 1218 (1960); *Carlson v. Commissioner*, 712 F.2d 1314, 1316 (9th Cir.1983). We see no clear error here.

The appellants point out the following: (1) The written leases use the term "one year" (far less than half the equipment's life) and do not include options to renew. (2) The Connors organized Sunset (as a purchaser/lessor), not to obtain ITC tax benefits, but to make certain that the two building companies (Connor Construction and Catamount) did not court labor law difficulties by using each other's equipment, and to obtain certain business advantages by not carrying the equipment costs on the books of the two building companies. (3) The companies' owners testified that Sunset bought the equipment expecting it to be used only on particular Connor Construction or Catamount jobs and then to be rented or sold to others. (4) A typical Connor Construction or Catamount job lasts only a few months. (5) The nature of the industry—the type of public work upon which the building companies bid—makes it difficult or impossible to predict whether equipment will be used again, because each job has so many bidders that the chance of either building firm obtaining any particular job is 1 in 40 or less. (6) The companies' owners testified that Sunset had, on occasion, bought equipment that it sold before half its useful life was over and that it had, in fact, sometimes rented the equipment to third parties. In addition, Sunset at some time acted as a distributor of specialized hardware for contractors, having sold at least some such equipment. (7) The owners added that Connor Construction and Catamount purchased some equipment themselves and sometimes rented equipment from outside sources, so that the supply relation between Sunset and the construction companies was not exclusive.

On the other hand, the Commissioner points to record evidence showing that: (1) Sunset, Catamount, and Connor Construction were controlled by the same people.

(2) From 1976 to 1980, the parties leased equipment by oral agreement. The written leases for 1979 and 1980 were executed "after the fact" on the advice of an accountant. (3) Sunset bought equipment when and as necessary to serve the needs of Connor Construction and Catamount, leaving them to rent from outsiders only what equipment was not worth acquiring because the need for it was too brief; Sunset was not in the business of leasing equipment to the construction industry in general; Connor Construction's and Catamount's needs for equipment were always expected to come first. (4) Sunset's tax returns from the period of the years at issue, 1976–80, reveal that it *never* sold any equipment to outsiders in those years, though it lost some equipment to casualty or theft in 1978. In fact, at the time the case was heard, Sunset had still not sold the equipment bought in 1979 and 1980. Rather, its owners testified that the main pieces of equipment they bought in those years had been used "almost continuously" since then, and that construction equipment does not become obsolete for many years. (5) Sunset could not point to *a single instance* between 1974, when it was created, and 1983, two years *after* the tax years in question, that it had *ever* leased a single piece of equipment to *any* firm (other than Connor Construction and Catamount) at all. The only equipment rentals to third parties consisted of a rental of one piece in November 1983, and four pieces in 1984. The sum total of earnings from this equipment, not including a crane on which no evidence was introduced, was $3,589.50, as compared to gross rentals received from Connor Construction and Catamount in 1980 alone of $362,463.00 (6) The limited distribution work that Sunset claims began only *after* the years in question here.

Given this evidence, we believe that the tax court could find that Sunset and the building firms "realistically contemplated" that Sunset would rent the equipment to those firms for more than half its useful

life, at the time the leases were made and irrespective of their language. After all, indefinite leasing arrangements seem to be what had happened in the past. The fact that the firms could not predict *which* jobs they would obtain does not mean they were unable to predict that they would likely receive *some* job. Indeed, the practice since 1980, while not relevant to the disposition of property before 1980, does indicate that construction equipment may well prove "generically useful" in various construction jobs. The close relations of the businesses, the fact that Sunset admittedly was created to serve the equipment needs of the building firms, the taxpayers' inability to show past rentals or sales to third parties from 1976 to 1980, and the fact that outside rentals by Connor Construction and Catamount occurred only after Sunset decided against purchase of the equipment all mean the tax court could reasonably reach its factual conclusion. For cases assessing these and similar factors in determining the "realistic contemplation" of the parties, see *Hokanson*, 730 F.2d at 1249–50; *Owen*, 53 T.C.M. at 1483–84; *Harvey*, 52 T.C.M. at 209–10; *Sanders*, 48 T.C.M. at 1220–21; *Peterson v. Commissioner*, 44 T.C.M. (CCH) 674, 677–80 (1982); *see also Highland Hills*, 272 F.2d at 179–80. To be more specific, it was not "clear error" for the tax court to find that the taxpayer had not proved the leases were for less than half the equipment's useful life.

The decision of the tax court is

*Affirmed.*

APPENDIX

*26 U.S.C. § 46(e)(3)(B) (1982) (amended 1986).*

> **(3) Noncorporate lessors.**—A credit shall be allowed by section 38 to a person which is not a corporation with respect to property of which such person is the lessor only if—
>
> (A) the property subject to the lease has been manufactured or produced by the lessor, or
>
> (B) the term of the lease (taking into account options to renew) is less than 50 percent of the useful life of the property, and for the period consisting of the first 12 months after the date on which the property is transferred to the lessee the sum of the deductions with respect to such property which are allowable to the lessor solely by reason of section 162 (other than rents and reimbursed amounts with respect to such property) exceeds 15 percent of the rental income produced by such property.

In the case of property of which a partnership is the lessor, the credit otherwise allowable under section 38 with respect to such property to any partner which is a corporation shall be allowed notwithstanding the first sentence of this paragraph. For purposes of this paragraph, an S corporation shall be treated as a person which is not a corporation. This paragraph shall not apply with respect to any property which is treated as section 38 property by reason of section 48(a)(1)(E). For purposes of subparagraph (B), in the case of any recovery property (within the meaning of section 168), the useful life shall be the present class life for such property (as defined in section 168(g)(2)).