DOUGLAS MULLINS, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent DAVID B. JORDAN, JR. AND JOYCE G. JORDAN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Mullins v. Commissioner
Docket Nos. 23349-86, 23350-86.
United States Tax Court
T.C. Memo 1989-129; 1989 Tax Ct. Memo LEXIS 129; 56 T.C.M. (CCH) 1557; T.C.M. (RIA) 89129; March 28, 1989. Gerald E. Wilson and Kurt Magette, for the petitioners. Richard F. Stein, for the respondent. CLAPP
MEMORANDUM FINDINGS OF FACT AND OPINION CLAPP, Judge: In these consolidated cases, respondent determined a $ 12,789.09 deficiency in the 1982 Federal income tax of petitioner Douglas Mullins, and a $ 21,199.83 deficiency in the 1982 Federal income tax of petitioners David B. Jordan, Jr. and Joyce G. Jordan. After concessions by both parties, the sole issue is *130 whether section 46(e)(3)(B) [1] disallows an investment tax credit passed through from petitioners' corporation, which was taxed under Subchapter S. [2]
FINDINGS OF FACT Most of the facts are stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by this reference. At the time the petitions were filed, Douglas Mullins (Mullins) resided in Coeburn, Virginia; David B. Jordan (Jordan) resided in Red Ash, Virginia and Joyce G. Jordan (who is a petitioner only because she filed a joint return with her husband) resided in Richlands, Virginia. Raven Smokeless Coal Corporation (Raven) is owned 60 percent by Jordan and 40 percent by Mullins. Its president is Jordan. Effective July 22, 1982, Raven elected to be taxed under Subchapter S. Virginia and *131 West Virginia Coal Corporation (Virginia) initially was owned 30 percent by Mullins, 20 percent by Jordan, 30 percent by Greg Mullins (no relation to Mullins) and 20 percent by Red Ash Collieries, Ltd. (owned by Jordan's brother and an unrelated third party). Since May 1983, Virginia has been solely owned by Red Ash Smokeless Coal Corporation (Red Ash), which is owned 60 percent by Jordan and 40 percent by Mullins. Jordan is Virginia's president. Virginia was not taxed under Subchapter S during 1982. On August 6, 17, and 31, 1982, Raven purchased three separate pieces of mining equipment for $ 456,105, $ 18,190 and $ 22,750, respectively. This mining equipment had a class life of 10 years. The most expensive of the three pieces of equipment was a "continuous miner" which cut rock in a mine. At the time that Raven purchased the mining equipment, it anticipated receiving a mining permit from the Virginia Division of Mines. This permit was not received until January 4, 1984. In order to put the mining equipment to use while waiting for the permit, Raven entered into a 12-month lease agreement with Virginia on September 15, 1982. Under the terms of the lease, Virginia was to *132 make rental payments to Raven which equalled $ 4 per clean ton of coal mined with the equipment. The rental payments were due on the 5th and 19th days of each month. The lease expired on September 14, 1983, but was extended for another 2 and 1/2 months. At the same time that they entered into the lease agreement, Raven and Virginia entered into a maintenance agreement. Under the terms of the maintenance agreement, Virginia was to maintain and repair all of the equipment that it leased from Raven, and Raven was to pay Virginia for this maintenance. The maintenance charge was $ 1 per clean ton of coal mined with the leased equipment. This maintenance charge was determined by Jordan and his accountant based upon their experience in the mining industry. Their records indicated that maintenance expenses on similar equipment varied between 50 cents and $ 2.50 per clean ton per month. The maintenance payments were due on the 5th and 19th day of each month. During the first 12 months of the lease, the required lease payments by Virginia totalled $ 221,044.36, and the required maintenance payments by Raven totalled $ 55,261.10. The maintenance payments were credited against the *133 lease payments. Accordingly, Virginia made actual payments to Raven of $ 165,783.26, or $ 3 per clean ton of coal mined. Some of the payments were made late. During the first 12 months that it owned the equipment covered by the lease, the only maintenance expenses incurred by Raven were the payments that it made to Virginia pursuant to the maintenance agreement. During the first year of the lease, Virginia issued $ 19,289.91 in checks to four different companies for repairs on the mining equipment. Virginia also incurred the cost of an electrician and a mechanic (earning a total of around $ 200 per day) who spent at least half of their working days maintaining the continuous miner. In addition, there were various equipment costs. The continuous miner was operated 5 days per week, 50 weeks per year. Immediately after the expiration of the lease extension with Virginia, Raven entered into an identical 12-month lease with Splashdam Smokeless Coal Corporation (Splashdam), whose sole stockholder was Red Ash. Jordan was President of Splashdam. Splashdam was not taxed under Subchapter S. The Splashdam lease was terminated several months later in late December 1983. After receiving *134 its mining permit in January 1984, Raven started mining operations and continued these operations until May 1987. Its gross sales from mining operations in both 1984 and 1985 were over $ 1,000,000. OPINION The only issue before the Court is whether petitioners are entitled to take an investment tax credit, passed through from Raven, on the mining equipment. The parties agree that petitioners have satisfied all the requirements for the investment tax credit except, possibly, for the requirements of section 46(e)(3)(B). That section sets requirements that must be met by noncorporate lessors, including corporations taxed under Subchapter S, of property for which the investment tax credit is to be claimed. The requirements are that the term of the lease be less than 50 percent of the useful life of the property, and that the lessor be entitled during the first 12 months of the lease to take deductions under section 162 that exceed 15 percent of the rental income produced by the property. [3]
*135 Respondent argues that the requirements of section 46(e)(3) are not satisfied because (1) the terms of the leases by Raven were of indefinite duration, (2) the maintenance agreement was a sham and (3) the payments required by Raven under the maintenance agreement were not allowable under section 162. Each argument will be considered separately. Lease Terms Were of Indefinite Duration
Respondent admits that the stated terms of all of the leases were of definite duration. He argues, however, that the stated terms were not in reality the actual terms and, thus, that the stated terms should be disregarded and the actual terms found to be indefinite. G. W. Van Keppel Co. v. Commissioner,295 F.2d 767 (8th Cir. 1961), affg. a Memorandum Opinion of this Court; Harvey v. Commissioner,T.C. Memo. 1986-381. He argues that the length of the term of the lease should be calculated in accordance with the "realistic contemplation" of the parties at the time of execution of the lease. [4]Hokanson v. Commissioner,730 F.2d 1245 (9th Cir. 1984), affg. a Memorandum Opinion of this Court; Ridder v. Commissioner,76 T.C. 867, 875 (1981). *136 In Sauey v. Commissioner,90 T.C. 824, 827 (1988), *137 we held that the burden of going forward in a case involving this issue is shifted to respondent if the lease contains a fixed and definite term which is less than 50 percent of the useful life of the asset and if there is no option to renew. Those requirements are satisfied here. Accordingly, respondent has the burden of going forward. Respondent has failed to present the evidence necessary to carry his burden of going forward. Respondent argues on brief that for several reasons the lease terms were indefinite. First, he claims that when Raven purchased the mining equipment it reasonably contemplated that it would be leasing the equipment indefinitely because it could not have reasonably expected to receive a mining permit in the near future. However, Jordan testified that when Raven ordered the continuous miner he anticipated receiving a mining permit. The permit was not received as soon as expected, and, in the interim, the equipment was leased to Virginia. Jordan's testimony is credible, and respondent has presented no evidence that would contradict that testimony. Second, respondent calculates that the total revenues Raven could have received from its mining operations *138 were $ 196,222.50. Respondent argues that no business would contemplate entering the mining business and spending $ 506,045 on mining equipment under these circumstances. Respondent's calculations are inaccurate as Raven's actual gross sales from mining operations in each of the years 1984 and 1985 were over $ 1,000,000. Third, respondent argues that there was common control of lessor and lessee, and that this is significant. He cites G. W. Van Keppel Co. v. Commissioner,supra at 771-772, and Highland Hills Swimming Club, Inc. v. Wiseman,272 F.2d 176, 180 (10th Cir. 1959). However, we have held that "the fact that petitioner and the corporation are related parties, standing alone, cannot be a basis for denying the investment credit to petitioners." Sauey v. Commissioner, supra at 829. Accordingly, the terms of the leases were less than 50 percent of the 10-year useful life of the equipment. Maintenance Agreement Was A Sham
Respondent next argues that the maintenance agreement was a sham, and, thus, that expenses deductible under section 162 did not exceed 15 percent of the rental income. As evidence, he notes that *139 Raven never actually issued checks for the maintenance payments, but instead that Virginia deducted the expenses from the rental payments. Respondent also notes that many of the rental payments by Virginia were late. These factors do not change the substance of the transaction. What is important is that Raven entered into a maintenance agreement, and under that agreement obligated itself to pay for maintenance to the equipment. It is clear that Raven reasonably estimated the maintenance expenses. During the first year of the lease, Virginia issued $ 19,289.91 in checks to four different companies for repairs on the mining equipment. Virginia also incurred the cost of an electrician and a mechanic (earning a total of around $ 200 per day) who spent at least half of their working day maintaining the continuous miner. The total annual cost of the electrician and the mechanic was around $ 25,000. Accordingly, Virginia incurred about $ 45,000 in expenses pursuant to its maintenance agreement, which is approximately 20 percent of the lease payments. The $ 55,261.10 in maintenance expenses paid by Raven to Virginia was a realistic estimate of actual maintenance expenses. This is *140 not an instance of an inflated maintenance charge designed to meet the 15-percent standard. We conclude that the maintenance agreement had substance, and that the maintenance expenses exceeded 15 percent of the rental payments. No Deductions Under Section 162
Finally, respondent argues that the maintenance expense was not a necessary expense, and, thus, is not deductible under section 162. As support for this argument, he points out that at trial there was testimony that Virginia paid its own maintenance expenses when it leased another piece of mining equipment. This is irrelevant, as a lessee's payment of maintenance expenses on one piece of equipment hardly establishes that a lessor is not entitled to a deduction under section 162 when the lessor pays maintenance expenses on another piece of equipment. Respondent cites no authority for his argument. Petitioner points out that "Section 162 expenses paid or payable by any person other than the lessor are not taken into account unless the lessor is obligated to reimburse the person paying the expense." Sec. 1.46-4(d)(3)(ii), Income Tax Regs.Virginia (lessee) paid the maintenance expenses, and Raven (lessor) was obligated *141 to reimburse Virginia. Thus, the maintenance expenses are taken into account for purposes of section 46(e)(3)(B). Petitioners are entitled to the investment credit passed through from their corporation, Raven. Decisions will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the year in issue. All Rule references are to the Tax Court Rules of Practice and Procedure. ↩
2. Petitioners have filed refund claims for the years 1979 and 1980 that are based upon carrybacks of the 1982 investment tax credits. However, the years 1979 and 1980 are not before the Court.↩
3. Section 46(e)(3) provides as follows: (3) NONCORPORATE LESSORS. -- A credit shall be allowed by section 38 to a person which is not a corporation with respect to property of which such person is the lessor only if -- * * * (B) the term of the lease (taking into account options to renew) is less than 50 percent of the useful life of the property, and for the period consisting of the first 12 months after the date on which the property is transferred to the lessee the sum of the deductions with respect to such property which are allowable to the lessor solely by reason of section 162 (other than rents and reimbursed amounts with respect to such property) exceeds 15 percent of the rental income produced by such property.↩
4. The "realistic contemplation" test was rejected in McNamara v. Commissioner,827 F.2d 168 (7th Cir. 1987), revg. T.C. Memo. 1986-300. The Court of Appeals held that the terms of a lease should be respected unless the lease is a sham manifested by the parties' "fixed intention that the lease will be continuously renewed on the same or substantively identical terms." McNamara v. Commissioner at 172. This Court is not obligated to follow McNamara, however, as appeal of the instant case would be to the Fourth, rather than the Seventh Circuit. Golsen v. Commissioner,54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971), cert. denied 404 U.S. 940 (1971). In the above regard see Connor v. Commissioner,847 F.2d 985 (1st Cir. 1988), affg. a Memorandum Opinion of this Court, wherein the First Circuit did not follow the test set forth in McNamara, but applied the "realistic contemplation" test. See also Hoisington v. Commissioner,833 F.2d 1398↩ (10th Cir. 1987), affg. a Memorandum Opinion of this Court.