ALAN GLICKMAN and RENEE C. GLICKMAN, MITCHELL SUSSMAN and LYNNE SUSSMAN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Glickman v. Commissioner
Docket No. 23822-89
United States Tax Court
T.C. Memo 1992-7; 1992 Tax Ct. Memo LEXIS 17; 63 T.C.M. (CCH) 1712; T.C.M. (RIA) 92007; January 6, 1992, Filed *17 James F. X. Rudy, for petitioners. David A. Breen, for respondent. RAUM, Judge. RAUM
MEMORANDUM OPINION The Commissioner determined deficiencies in the income taxes of Alan Glickman and Renee C. Glickman, husband and wife, as follows: Year
Deficiency
1983
$ 39,286
1984
38,300
He also determined deficiencies in the income taxes of Mitchell Sussman and Lynne Sussman, husband and wife, as follows: Year
Deficiency
1983
$ 26,832
1984
39,977
At the time the joint petition herein was filed, the Glickmans resided in Pennsylvania, and the Sussmans in New Jersey. The case was submitted on the basis of a stipulation of facts and exhibits pursuant to our Rule 122. [1]
At issue is whether each pair of petitioners is entitled to an investment tax credit (ITC) with respect to six intercity buses that the *18 husbands (referred to sometimes hereinafter as Sussman or Mitchell, and Glickman or Alan, respectively) purchased on April 18, 1983, and which they leased on May 1, 1983, to a family corporation, Starr Transit Co., Inc. (Starr Transit). The year 1984 is involved only by reason of carryovers. Starr Transit is a New Jersey corporation incorporated in 1948 for the purpose of engaging in the business of transporting persons and goods by motor carrier. Sussman and Glickman appear to have dominated the management of its business during the period here involved. Sussman is Starr Transit's president, and Glickman its vice president, secretary, and treasurer. On May 1, 1983, Sussman and Glickman were two of its three directors. The third director was Shirley Sussman-Klein (Shirley). Shirley was the widow of Gilbert G. Sussman (Gilbert), who died in 1969. Shirley and Gilbert were the parents of petitioner Mitchell Sussman. Gilbert was also the father of petitioner Renee Glickman by a marriage prior to his marriage to Shirley, who adopted Renee as her daughter. Mitchell Sussman, Alan Glickman, and Shirley continued to serve as the directors of Starr Transit as of the time the stipulation *19 herein was entered into in November 1990. On May 1, 1983, Starr Transit had only one class of stock issued and outstanding. Shirley owned 36.14 percent of the stock. The remaining 63.86 percent was held by a family trust created by Gilbert's will. On May 1, 1983, Shirley was acting as the sole trustee. Pursuant to the terms of Gilbert's will, Shirley is the life beneficiary of the trust. As simplified to the extent relevant herein, the remainder is divided into three equal parts, two of them for Mitchell and Renee, and the third for Ellen Croen, the sister of Mitchell and the half-sister of Renee. On or before January 2, 1980, the board of directors of Starr Transit determined that it should take steps to acquire additional buses for use in its business, and that there was a need to retain cash for the eventual funding of such acquisitions. Also at that time, Starr Transit began to consider leasing buses from third parties rather than purchasing additional buses for its fleet, and obtained proposed lease terms from such third parties. However, the record does not show whether it thereafter (or even prior thereto) leased any buses from any third parties. On May 1, 1983, Sussman *20 and Glickman [2] leased the six buses involved herein to Starr Transit for a stated term of 53 months, one month less than half of their useful life of 108 months or 9 years. They had purchased these buses on April 18, 1983, for $ 860,670.90. They paid only $ 11,000 of the purchase price in cash, and financed the remaining $ 849,670.90 with a note in that amount to a bank, secured solely by a security interest in the buses without guaranty or other security given by Starr Transit or anyone else. Beginning in 1980, and prior to leasing the six buses here at issue on May 1, 1983, Sussman and *21 Glickman had leased 14 other buses to Starr Transit. In 1980, they thus leased three buses, one each by Sussman and Glickman individually, and the third by both acting together. During 1981 Sussman and Glickman, acting either individually or jointly, leased five buses to Starr Transit. During 1982 they leased six additional buses to Starr Transit, four of them in January and February, and two in April. The leases of all 14 of the buses entered into during the period 1980-1982 had stated terms of 47 months, except the last lease, which had a stated term of 53 months. Upon expiration of the stated terms of all of the leases, (apart from those involving two of the buses leased in 1980), [3]Starr Transit continued to lease on a month-to-month basis all of the other 18 buses -- the six involved herein and 12 of those leased in prior years. The six buses leased in 1983, which are here in issue, were still being used by Starr Transit on a month-to-month basis when the stipulation of facts herein was entered into by the parties in November 1990. The monthly rental for these six buses remained the same following the end of the stated lease term on September 30, 1987. In the case *22 of 13 of the 14 buses leased earlier, the extended month-to-month periods ranged from about 16 months to 45 months. [4] After Starr Transit ceased using the buses on a month-to-month basis, they were sold to various parties, none of whom was related to Starr Transit or to any of the petitioners. The record does not show that Starr Transit leased any buses from anyone other than Sussman and Glickman. Nor does it show that Sussman and Glickman leased any buses to anyone other than Starr Transit except upon the premature termination of two of the 1980 leases and in one instance upon the termination of Starr Transit's month-to-month tenancy that followed the expiration of the fixed term of its lease of that bus. Upon termination of Starr Transit's month-to-month tenancy in respect of each of the remaining 11 buses, Sussman and Glickman promptly sold each bus. *23 On their tax returns for 1983, petitioners claimed investment tax credits with respect to the six buses they had purchased on April 18, 1983, and leased to Starr Transit on May 1 of that year. The Commissioner determined that petitioners were not entitled to any of these investment tax credits, because "it has not been established that the requirements of Section 46(e)(3) have been met in regard to leased buses." We sustain the determination of the Commissioner. Section 38(a) provides that "There shall be allowed, as a credit against the [income] tax * * *, the amount determined under Subpart B of this part." Subpart B includes section 46, which is concerned with the amount of the credit and contains various conditions and limitations upon its allowance. There is no dispute between the parties that, apart from section 46(e)(3), petitioners would be entitled to an ITC of 20 percent of the purchase price, consisting of the 10 percent "regular percentage", section 46(a)(2)(B), plus the 10 percent "energy percentage" applicable to the intercity buses herein, section 46(a)(2)(C)(i)(V). On their respective 1983 tax returns, the Sussmans and the Glickmans each sought the benefit of *24 an investment tax credit equal to 20 percent of the respective couple's claimed one-half share of the purchase price of the six buses bought in 1983 and leased to Starr Transit. The issue here involves the restrictions on the availability of such credit imposed by section 46(e)(3), which provides: (3) Noncorporate lessors. -- A credit shall be allowed by section 38 to a person which is not a corporation with respect to property of which such person is the lessor only if -- (A) the property subject to the lease has been manufactured or produced by the lessor, or (B) the term of the lease (taking into account options to renew) is less than 50 percent of the useful life of the property, and for the period consisting of the first 12 months after the date on which the property is transferred to the lessee the sum of the deductions with respect to such property which are allowable to the lessor solely by reason of section 162 (other than rents and reimbursed amounts with respect to such property) exceeds 15 percent of the rental income produced by such property.
The Commissioner contends that section 46(e)(3) prevents allowance of the investment tax credits claimed on petitioners' *25 returns. That section prohibits a noncorporate lessor from receiving the section 38 credit unless -- (A) the lessor manufactured or produced the property, or (B) the term of the lease (taking into account options to renew) is less than 50 percent of the useful life of the property (the 50 percent test), and within the first year after transfer of the property to the lessee, the sum of the deductions allowable with respect to the property solely by reason of section 162 exceeds 15 percent of the rental income produced by the property (the 15 percent test). The requirements of section 46(e)(3)(A) are not satisfied because Sussman and Glickman did not manufacture the buses they leased to Starr Transit. Accordingly, the requirements of section 46(e)(3)(B) must be met if petitioners are to receive the claimed credits. The Commissioner concedes that the 15 percent test has been satisfied. Thus, the sole matter in dispute is whether the lease satisfies the 50 percent test, which, as stated above, requires that the term of the lease be less than 50 percent of the useful life of the property. The Commissioner and petitioners agree that the useful life of the six buses leased in 1983 *26 is nine years (108 months), that the stated, fixed term of the lease pertaining to those buses was for 53 months, and that the lease did not contain any provision relating to any option to renew. Since one-half of the 108-month useful life is 54 months, the parties have stipulated that "the stated, fixed term of the Lease is * * * less than half of the useful life of the Buses." If that's all there were to this case, petitioners would plainly be entitled to prevail. However, as will appear shortly, section 46(e)(3) has been construed to require that the lease be for a term that is in substance as well as in form for a period of less than half the useful life of the property, and that if the parties actually intended the lease to continue for an indefinite period, the stated fixed term will be disregarded. We are faced at the outset with the same burden of proof and burden of going forward issue that was presented and dealt with in Borchers v. Commissioner, 95 T.C. 82 (1990), affd. 943 F.2d 22 (8th Cir. 1991). Both cases were submitted to us on a stipulated record, and we reach the same result here that we reached in Borchers. As in Borchers *27 , the record here contains stipulated facts sufficient to satisfy the Commissioner's burden of going forward, if such burden may properly be considered as being imposed upon him in these circumstances. It is true that if the Commissioner were charged with the burden of proof, such facts might or might not be sufficient to carry that burden. But the burden of proof is not upon the Commissioner. As we stated in Borchers, 95 T.C. at 90-91: It is hornbook law that the burden of proof is on the taxpayer, as shown in the oft-cited case of Welch v. Helvering, 290 U.S. 111 (1933), and in our Rule 142(a). And it is also well established that the taxpayer's burden of proof generally never shifts. United States v. Rexach, 482 F.2d 10, 16 (1st Cir. 1973); Llorente v. Commissioner, 74 T.C. 260, 276 (1980) (Tannenwald, J., concurring), affd. in part and reversed and remanded in part 649 F.2d 152 (1981). See Rockwell v. Commissioner, 512 F.2d 882, 885 (9th Cir. 1975), cert. denied 423 U.S. 1015 (1975), affg. a Memorandum Opinion of this Court; *28 Conforte v. Commissioner, 74 T.C. 1160, 1178-1179 (1980); Estate of Fittl v. Commissioner, T.C. Memo. 1986-452. Moreover, it is equally well established that the fact that a case is fully stipulated does not change the burden of proof. Zarin v. Commissioner, 92 T.C. 1084, 1089 (1989) [revd. on other grounds 916 F.2d 110 (3d Cir. 1990)]; accord Reinhardt v. Commissioner, 85 T.C. 511, 516 n. 6(1985); Service Bolt & Nut Co. Trust v. Commissioner, 78 T.C. 812, 819 (1982), affd. on other issues 724 F.2d 519 (6th Cir. 1983); Estate of Luehrmann v. Commissioner, 33 T.C. 277, 281 (1959), affd. 287 F.2d 10, 16 (8th Cir. 1961). The view expressed in these cases is reflected in our Rule 122(b), which reads: (b) Burden of Proof: The fact of submission of a case, under paragraph (a) of this Rule, does not alter the burden of proof, or the requirements otherwise applicable with respect to adducing proof, or the effect of failure of proof. [Fn. ref. omitted.]
In evaluating all the facts and circumstances to be considered *29 to determine whether a lease is to be treated in substance as operative for an indefinite term rather than being limited to a fixed term stated in the lease, there has developed among the decided cases the so-called "realistically contemplated" test. In short, the burden is on the taxpayer to establish that the parties to the lease realistically contemplated that the property would not continue to be leased for a period equal to or greater than one-half its useful life. Thus, it was held in Connor v. Commissioner, 847 F.2d 985, 989 (1st Cir. 1988), affg. T.C. Memo. 1987-223, that "the taxpayer must show that the parties, when they made the lease, 'realistically contemplated' that the lease would cover less than 50 percent of the property's useful life." Similarly, in Hokanson v. Commissioner, 730 F.2d 1245, 1249 (9th Cir. 1984), affg. T.C. Memo. 1982-414, the Ninth Circuit said "the burden was on the Hokansons to show affirmatively that the parties realistically contemplated that the terms of the leases would in fact be less than 4 years." The "realistically contemplated" (or "realistic contemplation") test *30 has been approved and applied in a number of cases regardless of whether "the taxpayer relies upon the stated fixed term in a lease or whether he seeks to show that a lease without a fixed term was really contemplated to last only for a limited period that is in compliance with the statutory requirement." Borchers v. Commissioner, supra at 95. Among the cases applying or approving the "realistically contemplated" test are the following: Schiff v. United States, 942 F.2d 348, 353 (6th Cir. 1991); Connor v. Commissioner, supra; Owen v. Commissioner, 881 F.2d 832, 834 (9th Cir. 1989), and McEachron v. Commissioner, 873 F.2d 176 (8th Cir. 1988), both affg. T.C. Memo. 1987-375; Hokanson v. Commissioner, 730 F.2d 1245, 1248 (9th Cir. 1984), affg. T.C. Memo. 1982-414; Borchers v. Commissioner, supra; Harvey v. Commissioner, T.C. Memo. 1986-381; cf. Ridder v. Commissioner, 76 T.C. 867, 875 (1981); Peterson v. Commissioner, T.C. Memo. 1982-442. [5]
*31 In our consideration of whether the 1983 lease here in controversy was in fact intended to be indefinite notwithstanding its stated term, we apply the substance versus form principle as articulated in the "realistically contemplated" test. In so doing, we find it helpful to consider the record in the light of the eight factors or types of facts and circumstances which in the past have aided us in determining whether a lease term was indefinite, and which were listed in Borchers v. Commissioner, 95 T.C. 82, 89 (1990) as follows: (1) An established practice on the part of the lessor of buying equipment for lease in order to meet the special needs of the lessee [Citations omitted.] (2) the lessor has control of the lessee [Citations omitted.] (3) the lessor leased only to the controlled lessee [Citations omitted.] (4) the lessee leased only from the lessor [Citations omitted.] (5) the leases were renewed either automatically or without renegotiation [Citations omitted.] (6) the equipment was sold once the lessee no longer needed it [Citation omitted.] (7) the purpose of the leasing arrangement was tax avoidance [Citations omitted.] and (8) the leasing was a *32 "financing arrangement." [Citation omitted.]
We now consider each of these factors as applied to the present case. 1. During the 4-year period 1980-1983, Sussman and Glickman leased 20 buses to Starr Transit, all obviously to meet the needs of the lessee. However, there is no explicit evidence in the record one way or the other whether they purchased all of those buses for that purpose. Moreover, there is no evidence or even any indication that Starr Transit obtained any buses during this period either by lease or purchase from any other source. 2. We are satisfied that Sussman and Glickman had control of the lessee. To be sure, such control did not rest upon stock ownership. However, the lessee is a family corporation, and they were its president, vice president, secretary, and treasurer. They were also two of its three member board of directors; the third was the mother. She also owned about one-third of the stock and was the sole trustee of a family trust that owned the remaining stock. She was the life beneficiary of the trust, and the three remaindermen were Sussman, his sister petitioner Renee Glickman, and another sister. Although it is quite true that the *33 mother, through her ownership of about one-third of the stock and power over the remaining stock as trustee, could technically control the corporation, there is nothing whatever in the record to suggest that Sussman and Glickman were not in truth and in fact actually in control of its affairs. It is actual control, not record ownership of stock, that is significant. Cf. Ach v. Commissioner, 42 T.C. 114, 125 (1964), affd. 358 F.2d 342 (6th Cir. 1966); Grenada Industries v. Commissioner, 17 T.C. 231, 254 (1951), affd. 202 F.2d 873 (5th Cir. 1953). The record before us does not contain the slightest indication of any family disharmony that might adversely affect the actual control that Sussman and Glickman exercised over the lessee, Starr Transit. 3. As already noted, petitioners Sussman and Glickman leased 20 buses to Starr Transit over the 4-year period ending with the tax year 1983. The record shows that they leased only three buses to any lessee other than to Starr Transit, but even those three had first been leased to Starr Transit, and were thereafter leased or sold to an unrelated party after Starr Transit *34 had ceased using them. 4. Again, we refer to the 20 buses leased to Starr Transit. The record is devoid of any suggestion that it leased from anyone other than Sussman and Glickman. 5. Apart from the leases of two buses leased in 1980, the leases on the remaining 18 buses were renewed on a month-to-month basis either automatically or, as far as appears in the record, without renegotiation. 6. All of the buses that Starr Transit ceased using were sold immediately thereafter except for the three buses described above in our comment on the third factor, which were thereafter leased to another party prior to eventual sale. 7. There is much to indicate that the purpose of the 53-month term lease was tax avoidance. In the first place, it requires no imagination to discern that the unusual 53-month period is but one month short of 50 percent of the 9-year useful life of the buses. Why such an odd number as 53, other than its usefulness in an attempt to nail down the tempting investment tax credit? That it was nothing more than a transparent tax avoidance device is confirmed by the month-to-month retention of the buses at the same rental upon the expiration of the 53-month term. *35 [6]
8. The leasing per se was not a "financing arrangement", although we note that the purchase price of the buses was $ 860,670.90, and that Sussman and Glickman paid only $ 11,000 in cash and financed *36 the remaining $ 7 849,670.90 with a note to a bank that was secured solely by a security interest in the buses. We emphasize again that the burden of proof was upon petitioners, not upon the Government, and after considering the entire record we are fully satisfied that petitioners have not carried their burden of proof. In the circumstances, we find as a fact that the parties to the 1983 lease of the six buses in issue realistically contemplated that the buses were to be under lease to Starr Transit for an indefinite period. Petitioners have relied extensively upon Sauey v. Commissioner, 90 T.C. 824 (1988), affd. without published opinion, 881 F.2d 1086 (11th Cir. 1989). However, Sauey is distinguishable for the same reason that we found it distinguishable in Borchers v. Commissioner, 95 T.C. 82, 93 (1990). Decision will be entered for respondent. Footnotes
1. All Rule references are to the Tax Court Rules of Practice and Procedure. All section references are to the Internal Revenue Code as amended and in effect for the taxable year at issue.↩
2. Sussman and Glickman sometimes used the trade names, "Starr Associates I" and "Starr Associates II", respectively, when they leased buses to Starr Transit. Since these trade names do not appear to be of any consequence here, all activities entered into by Sussman and Glickman will be referred to herein simply as having been conducted by them as individuals rather than by the fictitious entities suggested by the trade names.↩
3. As to the two buses leased in 1980 referred to above, the leases were terminated on or before April 9, 1983, before the expiration of their respective terms, and those buses were then leased to an unrelated party for terms of 16 months each. Upon expiration of the 16-month terms, such leases were renewed on a month-to-month basis, and the buses were ultimately sold to that lessee. ↩
4. The remaining bus continued to be held by Starr Transit on a month-to-month basis for 2 months.↩
5. As we noted in Borchers v. Commissioner, 95 T.C. 82, 95 n.6 (1990), affd. 943 F.2d 22 (8th Cir. 1991), the court in McNamara v. Commissioner, 827 F.2d 168 (7th Cir. 1987), vacating and remanding T.C. Memo. 1986-300, is the only court that has rejected the "realistically contemplated" test, and substituted therefor a test requiring the Government to show that the arrangement was a "sham". However, McNamara has been in turn explicitly rejected by Connor v. Commissioner, 847 F.2d 985, 989 (1st Cir. 1988), affg. T.C. Memo. 1987-223, and Schiff v. United States, 942 F.2d 348, 353 (6th Cir. 1991), and the "realistically contemplated" test has been followed in an impressive number of cases. Moreover, as the Sixth Circuit pointed out, the McNamara rule is "inappropriate because it shifts the burden of proof to the government, * * * ignoring the thrust of Rule 142(a), Tax Court Rules of Practice and Procedure * * * (taxpayer bears burden of proof in protesting deficiency assessed by Commissioner)". Schiff v. United States, supra↩ at 352.
6. Except for the last lease in 1982, all of the pre-1983 leases were for terms of 47 months, an odd or unusual period of time for a lease. However, simple arithmetic discloses that a 47-month term is just one month short of 48 months, a period that is precisely 50 percent of 8 years (or 96 months). This strongly suggests that the buses covered by those earlier leases were then thought to have a useful life of 8 years. We have no issue before us relating to the pre-1983 years, and do not undertake to pass upon them, except to note that they may indicate a pattern of crafting leases just one month short of the desired 50 percent of the then-estimated useful life followed by a month-to-month tenancy upon expiration of the fixed term. However, we have not relied upon this consideration in reaching our decision herein.↩